# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

## PEOPLE v CHENAULT

Docket Nos. 146523 and 146524. Argued December 12, 2013 (Calendar No. 6). Decided April 4, 2014.

An Oakland Circuit Court jury convicted Schuyler D. Chenault of felony murder, MCL 750.316(1)(b), and possession of a firearm during the commission of a felony, MCL 750.227b, arising out of the shooting death of Kevin Harris, a cocaine dealer, during a drug transaction in which defendant was involved. The sole question at trial was the identity of the shooter. During one of her interviews with the police, Heather Holloway (Harris's girlfriend) identified defendant as the shooter. Her interviews were videotaped, but defendant's counsel did not receive copies of the recordings. Holloway's written statements did not mention that Jared Chambers (a middleman whom Harris sometimes used) was also present at the shooting. Only defendant, Holloway, and Chambers witnessed the shooting, and there was no physical evidence to tie either defendant or Chambers to the shooting. The defense theory was that Chambers shot Harris and that Holloway identified defendant as the shooter out of fear of Chambers. A month after the trial, defense counsel moved for a new trial and requested a copy of the recordings of Holloway's interviews. Defense counsel also added claims of ineffective assistance of counsel and prosecutorial misconduct regarding the failure to provide the recordings. The court, Daniel Patrick O'Brien, J., granted defendant's motion for a new trial, concluding that his due process rights had been violated under *Brady v Maryland*, 373 US 83 (1963), because the suppressed videotaped recordings undermined confidence in the outcome of the trial. The Court of Appeals, FORT HOOD, P.J., and K. F. KELLY and DONOFRIO, JJ., reversed in an unpublished opinion per curiam, issued November 27, 2012 (Docket Nos. 309384 and 310456). The panel analyzed the *Brady* claim using the four-factor test articulated in *People v Lester*, 232 Mich App 262 (1998), which had added a requirement of due diligence to the *Brady* test, and concluded that defense counsel had not exercised due diligence and that the suppressed evidence was neither favorable nor material. It also held that defendant had not been denied the effective assistance of counsel because there was no prejudice. Defendant sought leave to appeal, which the Supreme Court granted. 494 Mich 862 (2013).

In a unanimous opinion by Justice MCCORMACK, the Supreme Court *held*:

*Brady* and its progeny do not support a diligence requirement, and *Lester* must be overruled.

1. *Brady* held that the prosecution's suppression of evidence favorable to an accused upon request violates due process when the evidence is material to either guilt or punishment, irrespective of the prosecution's good or bad faith. The United States Supreme Court articulated the essential components of a *Brady* violation in a three-factor test: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching, (2) the prosecution must have suppressed that evidence, either willfully or inadvertently, and (3) prejudice must have ensued, that is, the evidence must be material. The government is held responsible for evidence within its control, even evidence unknown to the prosecution, without regard to the prosecution's good or bad faith. Evidence is favorable to the defense when it is either exculpatory or impeaching. To establish materiality, the defendant must show a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. This standard does not require demonstrating by a preponderance of the evidence that disclosure of the suppressed evidence would have ultimately resulted in the defendant's acquittal. The question is whether in the absence of the suppressed evidence, the defendant received a fair trial, that is, a trial resulting in a verdict worthy of confidence. In assessing the materiality of the evidence, courts must consider the suppressed evidence collectively, rather than piecemeal.

2. In *Lester*, the Court of Appeals added an additional requirement to the *Brady* test: that the defendant did not possess the evidence and could not have obtained it himself or herself with any reasonable diligence. Neither the United States Supreme Court nor the Michigan Supreme Court has endorsed this element. Any concerns that a diligence requirement might address are already confronted in the context of *Brady*'s suppression requirement and the Sixth Amendment's guarantee of the effective assistance of counsel. A diligence rule of the sort adopted in *Lester* is contrary to *Brady*. The *Brady* rule is aimed at defining an important prosecutorial duty; it is not a tool to ensure competent defense counsel. Adding a diligence requirement to the rule undermines the fairness that it is designed to protect. Because the four-factor *Lester* test was not doctrinally supported and undermined the purpose of *Brady*, it was overruled. The controlling test is that articulated in *Strickler v Greene*, 527 US 263 (1999): (1) the prosecution has suppressed evidence (2) that is favorable to the accused and (3) viewed in its totality, material.

3. Defendant's *Brady* claim failed because the suppressed evidence was not material to his guilt. The prosecution conceded that the evidence in question was suppressed, leaving the questions of whether the suppressed evidence was favorable to defendant, either as exculpatory or impeaching evidence, and whether it was material. Only three people witnessed the shooting. Other than Holloway's and Chambers's testimony, no other evidence at trial identified defendant as the shooter. Because the videotaped statements could have impeached Holloway and Chambers as well as undermined the strength of Holloway's identification of defendant, the evidence was favorable to the defense. The suppressed evidence was not material, however. The question was not whether defendant would more likely than not have received a different verdict with the evidence, but whether in its absence defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence. Even in the absence of the suppressed evidence, defendant received such a trial because the cumulative effect of the evidence was not material. The promises of leniency made to both Holloway and Chambers were not material;

they were not conditioned on any behavior on their part. The evidence would not have undermined Holloway's identification of defendant in a material way. Despite minor discrepancies, Holloway identified defendant with confidence, and her qualifications about her ability to view the shooter did not undermine the overall strength of her identification. The suppressed evidence also did not contain information that would lead to the conclusion that defense counsel would have asserted that Holloway misidentified defendant rather than the cover-up theory pursued at trial.

4. Defendant could not establish the prejudice necessary to prevail on his claim of ineffective assistance of counsel. Defendant claimed that defense counsel was ineffective for failing to investigate and acquire the recordings during trial. Defendant could not establish a *Brady* violation because the suppressed evidence was not material, however, and *Brady* materiality is assessed under the same reasonable-probability standard as that used to assess prejudice for purposes of ineffective assistance of counsel.

Court of Appeals' result affirmed.

©2014 State of Michigan

# Opinion

Chief Justice:          Justices:
Robert P. Young, Jr.   Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

FILED APRIL 4, 2014

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                             Nos. 146523 and146524

SCHUYLER DION CHENAULT,

      Defendant-Appellant.

---

BEFORE THE ENTIRE BENCH

MCCORMACK, J.

In this case we consider the proper test for applying the United States Supreme Court's decision in *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). In *People v Lester*, 232 Mich App 262; 591 NW 2d 267 (1998), the Court of Appeals adopted a four-factor test that added a requirement of defendant diligence to the traditional *Brady* test. Neither the Supreme Court of the United States nor this Court has endorsed this element.

We hold that a diligence requirement is not supported by *Brady* or its progeny. Thus, we overrule *Lester* and reaffirm the traditional three-factor *Brady* test. Because the

defendant cannot establish that the suppressed evidence was material, however, his *Brady* claim nevertheless fails. Accordingly, we affirm the result reached by the Court of Appeals.

## I. FACTS AND PROCEDURAL BACKGROUND

The defendant's convictions for felony murder, MCL 750.316(1)(b), and possession of a firearm during the commission of a felony, MCL 750.227b, arose out of the shooting death of Kevin Harris in Pontiac, Michigan, on June 29, 2008. Harris was a cocaine dealer, who often used Jared Chambers as a middleman to connect with buyers. Chambers occasionally contacted Harris through Harris's girlfriend, Heather Holloway.

On June 29, 2008, Chambers arranged a transaction between the defendant and Harris. The defendant and Chambers, together with several others, met Harris on a side street in Pontiac. Harris pulled up behind the defendant's car. Holloway was in Harris's passenger seat. As both Chambers and the defendant approached Harris' car, shots were fired at Harris, and he was struck in the head.

The Pontiac Police Department conducted an investigation and interviewed Holloway on June 29 and July 2, 2008, and Chambers on June 30, 2008. All of these interviews were video recorded. Holloway also produced two written statements, one after each interview, and Detective Steven Wittebort summarized the interviews in an incident report. Holloway's written statements and the police report summarizing them were provided to defense counsel before trial, but the video recordings were not.

Holloway was more forthcoming in her second interview than in her first. At her first interview, Holloway told the police that two unknown men walked up to the car and

2

shot Harris. During her second interview, which took place after Harris died on June 30, 2008, Holloway said that Harris had been shot as part of a drug deal. Although Holloway identified the defendant in a photo array, neither of Holloway's written statements mentioned Chambers's presence. According to Wittebort's report, Holloway said that she did not get a good look at the shooter but that she could identify him. The report also revealed that she confidently selected the defendant's photo from an array.

The defendant never denied that he was present at the scene of the shooting, and most of the facts were likewise not in dispute. The sole question at trial concerned the identity of the shooter. Only the defendant, Holloway, and Chambers witnessed the shooting and, unsurprisingly, they did not agree about what happened: the defendant identified Chambers as the shooter while Holloway and Chambers identified the defendant.[1] There was no physical evidence to tie either the defendant or Chambers to the shooting. The defense theory was that Chambers shot Harris, and that Holloway identified the defendant as the shooter out of fear of Chambers.

On the last day of trial, the prosecution called Wittebort as its final witness. When questioned, Wittebort was surprised that Holloway's second written statement did not confirm that she had mentioned Chambers and was confident that the video recordings would verify his recollection. He was also surprised to learn that the recordings had not

---

[1] Three others were present at the scene, but did not provide any evidence supporting either theory. Two of them were never questioned by police. The third did not see who shot Harris but testified that immediately after the shot was fired, he saw the defendant standing on the driver's side of Harris's car. The prosecution concedes that the Court of Appeals was mistaken in stating otherwise.

been provided to the defendant. On March 11, 2010, the defendant was convicted of felony murder and felony-firearm.

On April 13, 2010, defense counsel filed a motion for a new trial and requested a copy of the interview recordings. Later, counsel amended the motion to add claims of ineffective assistance of counsel and prosecutorial misconduct regarding the failure to provide the recorded statements. There was no dispute that the defendant never had the recordings.[2] The trial court conducted two evidentiary hearings on the motion. On February 29, 2012, Wittebort testified that the police generally let the prosecution know when recordings are available, but the regular practice was to provide them only "if there's an admission or something of that nature from the person of interest or defendant in that matter."[3] On March 8, 2012, the trial court granted the defendant's motion for a new trial, concluding that his due process rights were violated pursuant to *Brady* because the suppressed videotaped recordings undermined confidence in the outcome of the trial.

The Court of Appeals reversed the trial court. *People v Chenault*, unpublished opinion per curiam of the Court of Appeals, issued November 27, 2012 (Docket Nos. 309384 and 310456). The Court of Appeals analyzed the *Brady* claim using the four-factor test articulated in *Lester*. The Court held that trial counsel had not exercised due diligence, and that the suppressed evidence was neither favorable nor material. It also

---

[2] In fact, the defendant's first counsel submitted an affidavit stating that he had not received the recorded statements.

[3] Wittebort also testified that he had never heard of the phrase "*Brady* material."

4

held that the defendant was not denied the effective assistance of counsel because there was no prejudice.

On June 5, 2013, this Court granted leave to appeal, directing the parties to address:

> (1) whether the Court of Appeals' decision in *Lester* correctly articulates what a defendant must show to establish a *Brady* violation; (2) whether the Court of Appeals erred when it reversed the trial court's grant of a new trial, which was premised on the prosecution's violation of the rule from *Brady*; and (3) whether trial counsel rendered ineffective assistance of counsel under *Strickland* for failing to exercise reasonable diligence after learning of the existence of the videotaped interviews. [*People v Chenault*, 494 Mich 862 (2013) (citations omitted).]

## II. LEGAL BACKGROUND

The Supreme Court of the United States held in *Brady* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 US at 87. In identifying the essential components of a *Brady* violation, the Supreme Court has articulated a three-factor test:

> The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. [*Strickler v Greene*, 527 US 263, 281-282; 119 S Ct 1936; 144 L Ed 2d 286 (1999).]

Stated differently, the components of a "true *Brady* violation," are that: (1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material. *Id*.

The contours of these three factors are fairly settled. The government is held responsible for evidence within its control, even evidence unknown to the prosecution,

*Kyles v Whitley*, 514 US 419, 437; 115 S Ct 1555; 131 L Ed 2d 490 (1995), without regard to the prosecution's good or bad faith, *United States v Agurs*, 427 US 97, 110; 96 S Ct 2392; 49 L Ed 2d 342 (1976) ("If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor."). Evidence is favorable to the defense when it is either exculpatory or impeaching. *Giglio v United States*, 405 US 150, 154; 92 S Ct 763; 31 L Ed 2d 104 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule [of *Brady*]."), quoting *Napue v Illinois*, 360 US 264, 269; 79 S Ct 1173; 3 L Ed 2d 1217 (1959). To establish materiality, a defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v Bagley*, 473 US 667, 682; 105 SC 3375; 87 L Ed 2d 481 (1985). This standard "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ." *Kyles*, 514 US at 434. The question is whether, in the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* In assessing the materiality of the evidence, courts are to consider the suppressed evidence collectively, rather than piecemeal. *Id.* at 436.

In contrast to the three-factor *Brady* test articulated by the United States Supreme Court, our Court of Appeals adopted a four-factor *Brady* test in 1998:

6

In order to establish a *Brady* violation, a defendant must prove: (1) that the state possessed evidence favorable to the defendant; (2) that he did not possess the evidence nor could he have obtained it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. [*Lester*, 232 Mich App at 281, citing *United States v Meros*, 866 F 2d 1304, 1308 (CA 11, 1989).]

The inclusion of the second factor is the only difference between the *Lester* test and the test articulated in *Strickler*. Although *Lester* did not involve a question of a defendant's diligence, the Court of Appeals relied on authority from the United States Court of Appeals for the Eleventh Circuit for this additional requirement, now widely referred to as a "due diligence" or "reasonable diligence" factor. This test has been applied by our Court of Appeals since *Lester*.

## III. *BRADY* DISCLOSURES

### A. *PEOPLE v LESTER* AND THE ADDITION OF A DILIGENCE REQUIREMENT

This is the first occasion on which this Court has examined the merits of the diligence requirement. Some understanding of its doctrinal history is useful. As noted, the Court of Appeals borrowed the four-factor test from the Eleventh Circuit's opinion in *Meros*, 866 F 2d at 1308, which in turn cited another Eleventh Circuit case, *United States v Valera*, 845 F 2d 923, 927-928 (CA 11, 1988). In *Valera*, the Eleventh Circuit relied on two cases from the Fifth Circuit, *United States v Cravero*, 545 F2d 406, 420 (CA 5, 1976), and *United States v Prior*, 546 F2d 1254, 1259 (CA 5, 1977). Both of these Fifth Circuit cases in turn relied on authority from other circuits.[4]  None of these cases,

---

[4] *See Cravero*, 545 F2d at 420 n 46, citing *Maglaya v Buchkoe*, 515 F 2d 265, 268 (CA 6, 1975), and *United States v Ruggiero*, 472 F2d 599, 604 (CA 2, 1973); *Prior*, 546 F2d at

7

however, provides a sufficient explanation for adding a diligence requirement to the Supreme Court's three-factor *Brady* test and are consequently of little value to us.

We disagree with the prosecution's suggestion that the diligence requirement is consistent with or implied by United States Supreme Court precedent. Nor do we conclude that a diligence requirement is consistent with the *Brady* doctrine generally. We believe that the concerns that a diligence requirement might address are already confronted in the context of *Brady*'s suppression requirement as well as in the Sixth Amendment's guarantee of the effective assistance of counsel. For these reasons, we reject the addition of a diligence requirement to the *Brady* test and we overrule *Lester*.

We are not persuaded by the prosecution's reliance on *Agurs* and *Kyles* for the proposition that the diligence requirement is merely a clarification of existing Supreme Court precedent. The prosecution argues that the phrase "unknown to the defense," as used in these two cases, suggests that the Supreme Court would affirm the addition of a diligence requirement to the *Brady* analysis. Specifically, the argument goes, the phrase "unknown to the defense" implies that *Brady* places some sort of burden onto the defense

1259, citing *Williams v United States*, 503 F2d 995 (CA 2, 1974), *United States v Purin*, 486 F2d 1363 (CA 2, 1973), *Wallace v Hocker*, 441 F2d 219 (CA 9, 1971), and *United States v Brawer*, 367 F Supp 156 (SD NY, 1973). None of these cases articulated a diligence prong of the sort that the Court of Appeals applied in this case. In each of these cases, the factual predicate was different in an important way because the defendant had actual knowledge of the evidence in question. In other words, the evidence was not "suppressed." In particular, *Ruggiero* explicitly (and, in our view, appropriately) addressed diligence under the suppression prong of *Brady*, finding there was no suppression when the government provided the requested evidence to the trial court for an in camera inspection and ruling. *Ruggiero*, 472 F2d at 604.

8

to discover *Brady* information when possible.  We do not share the prosecution's understanding of the meaning of this phrase in either case.

In *Agurs*, the Supreme Court identified three different contexts in which *Brady* applies, stating that "[e]ach involves the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." *Agurs*, 427 US at 103.  The phrase is best understood as a general description of what constitutes *Brady* evidence, instead of the imposition of a new hurdle for defendants.[5]  We see no additional meaning to the phrase given its context.

The *Kyles* Court held that "showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation without more." *Kyles*, 514 US at 437.  The phrase is used in a larger discussion of the materiality requirement and the prosecution's duty to gauge the likely effect of potential *Brady* evidence: although the mere showing that the prosecution knew of evidence that was unknown to the defense does not amount to a *Brady* showing by itself, *Brady* imposes on the prosecution "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id.*  Read in context, this language is meant to define the prosecution's duty both to become aware of evidence in the government's possession and to weigh the materiality of evidence.  We believe that if the Supreme Court wanted to articulate a diligence requirement, it would do so more directly.  It has not.

---

[5] *Bagley* retreated from the different materiality standards articulated in *Agurs*.  *Bagley*, 473 US at 682.  Thus, any reliance on the *Agurs* language as an articulation of existing Supreme Court precedent is undermined.

Moreover, we do not believe that the goals of *Brady* counsel in favor of adopting a diligence requirement. The Supreme Court has consistently stated that, when confronted with potential *Brady* evidence, the prosecution must always err on the side of disclosure. *Kyles*, 514 US at 439; *Agurs*, 427 US at 108. Just recently the Supreme Court underscored this obligation:

> Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed. As we observed in *Strickler*, defense counsel has no "procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred." . . .

> The State here nevertheless urges, in effect, that "the prosecution can lie and conceal and the prisoner still has the burden to . . . discover the evidence," so long as the "potential existence" of a prosecutorial misconduct claim might have been detected. A rule thus declaring "prosecutor may hide, defendant must seek," is not tenable in a system constitutionally bound to accord defendants due process . . . . We have several times underscored the "special role played by the American prosecutor in the search for truth in criminal trials." Courts, litigants, and juries properly anticipate that "obligations [to refrain from improper methods to secure a conviction] . . . plainly rest[ing] upon the prosecuting attorney, will be faithfully observed." Prosecutors' dishonest conduct or unwarranted concealment should attract no judicial approbation.[6]

In fact, we conclude that a diligence rule of the sort adopted by the Court of Appeals in *Lester* is contrary to *Brady*, i.e., a rule requiring a defendant to show that counsel performed an adequate investigation in discovering the alleged *Brady* material.

---

[6] *Banks v Dretke*, 540 US 668, 695-696; 124 S Ct 1256; 157 L Ed 2d 1166 (2004) (citations omitted). In reliance on this language, the Sixth Circuit recently "decline[d] to adopt the due diligence rule that the government proposes based on earlier, erroneous cases." *United States v Tavera*, 719 F 3d 705, 712 (CA 6, 2013).

The *Brady* rule is aimed at defining an important prosecutorial duty; it is not a tool to ensure competent defense counsel. Adding a diligence requirement to this rule undermines the fairness that the rule is designed to protect. However, as we previously explained, evidence that the defense knew of favorable evidence, will reduce the likelihood that the defendant can establish that the evidence was suppressed for purposes of a *Brady* claim.[7]

We decline to adopt the four-factor *Lester* test, as we believe it is not doctrinally supported and undermines the purpose of *Brady*. We hold that the controlling test is that articulated by the Supreme Court in *Strickler*, no less and no more: (1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) viewed in its totality, is material.

## B. APPLICATION OF *BRADY* TO THIS CASE

We now apply the controlling *Brady* test to the defendant's claim. As an initial matter, we note that the prosecution has conceded that the evidence in question was suppressed.[8] That leaves two questions: whether the suppressed evidence was favorable

---

[7] Failures on the part of defense counsel to make use of known and available evidence can instead be evaluated under the Sixth Amendment's guarantee of effective assistance of counsel. To be sure, there is a relationship between *Brady* claims and ineffective assistance of counsel claims: when the government complies with its obligation to provide favorable and material evidence, it becomes the defendant's burden to then make use of that evidence. If defense counsel's failure to make use of the evidence is not strategic and prejudice results, the defendant will surely bring an ineffective assistance of counsel claim.

[8] As noted, the defendant's first counsel never received the recorded statements. Additionally, all three assistant prosecutors never received the recorded statements, as evidenced by their affidavits submitted in the trial court. At the second evidentiary hearing, the prosecution stated, "Certainly it was not disclosed – it was not turned over to

to the defendant, either as exculpatory or impeaching evidence, and whether it was material.

In contrast to the question of materiality, the favorability of evidence is a simple threshold question that need not delay us long. Only three people witnessed the shooting: Holloway, Chambers, and the defendant. Other than the testimony of Holloway and Chambers, there was no other evidence at trial that identified the defendant as the shooter. Because the videotaped statements could have impeached Holloway and Chambers as well as undermined the strength of Holloway's identification, the evidence was favorable to the defense.

We are not convinced, however, that the suppressed evidence was material. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 US at 434.

them and the police had it, so truthfully, my understanding of the case law . . . it really doesn't matter whether it was intentional or inadvertent, the question is if it wasn't disclosed and is it exculpatory, would it affect the trial . . . ." The prosecution also stated specifically that the evidence was suppressed: "Well, I would say prong three [of *Brady*] is satisfied. The prosecutor suppressed – well, we did not give out the evidence but we don't agree it's favorable . . . ." At no point before the trial court or the Court of Appeals did the prosecution argue otherwise. The prosecution argued that the evidence was not suppressed for the first time at oral argument before this Court, and we decline to address this argument. That the *existence* of the videotapes was discovered before the end of trial does not change our view because the prosecution waived the argument that the midtrial disclosure and defense counsel's subsequent actions affected the defendant's ability to show that he was prejudiced for purposes of his *Brady* claim. Although a defense counsel's failure to ask for a continuance may be relevant in a case where defense counsel has actual knowledge of the suppressed evidence midtrial, *see*, e.g., *State v Spivey*, 102 NC App 640, 646; 404 SE2d 23 (1991), we decline to address this issue in light of the prosecution's waiver.

We conclude that, even in the absence of the suppressed evidence, the defendant received a trial that resulted in a verdict worthy of confidence, because the cumulative effect of the evidence was not material.

We disagree with the defendant that Wittebort's promises of leniency to both Holloway and Chambers were material. While the detectives assured both witnesses that they would not be investigated or charged for drug crimes, these promises of leniency were not conditioned on any behavior on the part of the witnesses. Indeed, Chambers decided not to make any written statement even after such promises were made, and, likewise, any alleged promises of leniency occurred after Chambers implicated himself in the drug activity. For her part, Holloway also admitted that she lied in her first interview, promises of leniency notwithstanding, and in her second interview, the alleged promises were made *after* she disclosed the drug activity.

We are similarly unconvinced that the evidence would have undermined Holloway's identification of the defendant in a material way. While there were minor discrepancies between the characterization of Holloway's identification as expressed in the disclosed material and at trial as contrasted with her recorded identification, she was able to quickly identify the defendant as the shooter in her second interview.[9] Although

_____

[9] Specifically, in her first interview, Holloway was asked if she saw the shooter's face "pretty good." Holloway responded, "Not that good, I could, maybe if I seen him you know I might be able to say it was him." In her second interview, Holloway stated: "[I]f I seen him . . . , I could be like that's that guy, I know it." After picking defendant in the photo array she stated: "This guy right here. This is him right here." Detective Wittebort told her to circle it, and she stated: "I think this is him, out of all these guys that looks the most." After Holloway initialed the photo, she *again* stated: "I know that's him." Moreover, contrary to the defendant's argument, there is nothing unduly suggestive regarding the photo lineup.

13

the specific strong language that Wittebort attributed to Holloway as she identified the defendant is not supported by the recording, Holloway did identify the defendant with confidence. Holloway's honest qualifications about her ability to view the shooter do not undermine the overall strength of her identification.

Finally, we disagree with the defendant that the suppressed evidence supports his trial theory that Chambers was the shooter, and that Holloway only identified the defendant as the shooter out of fear of Chambers. Although Holloway was not forthright in her first statement about Chambers's involvement, in her second interview she expressed confidence that Chambers must have been involved. If Holloway were frightened of Chambers to the extent that she would implicate an innocent third party, she would not have engaged in a discussion with the police about Chambers's own culpability. The suppressed evidence did not contain information that leads us to conclude that defense counsel would have asserted the defense that Holloway misidentified the defendant, rather than the cover-up theory that defense counsel pursued at trial. Furthermore, another witness placed the defendant on the side of Harris's car where the shooter indisputably stood.

We therefore conclude that, even in the absence of the suppressed evidence, the defendant received a trial that resulted in a verdict worthy of confidence. The defendant's *Brady* claim must fail because the suppressed evidence was not material to his guilt.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

The defendant also raises a claim that trial counsel was ineffective for failing to investigate and acquire the video recordings during trial. Whether a defendant received ineffective assistance of counsel presents a mixed question of fact and law. *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). A trial court's factual findings are reviewed for clear error; questions of law are reviewed de novo. *Id.* We have determined that the defendant cannot establish a *Brady* violation because the suppressed evidence was not, in sum, material. As *Brady* materiality is assessed under the same "reasonable probability" standard that is used to assess prejudice under *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 LEd2d 674 (1984),[10] we similarly conclude that the defendant cannot establish prejudice in order to prevail on his ineffective assistance of counsel claim.

## V. CONCLUSION

We conclude that *Brady* does not support the adoption of a diligence requirement and we therefore overrule *Lester*. In order to establish a *Brady* violation, a defendant need only demonstrate that the government suppressed evidence that is both favorable to the defendant and material. Because the defendant cannot establish that the suppressed

---

[10] Compare *Bagle*y, 473 US at 682 (stating that to establish materiality, a defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome"), with *Strickland*, 466 US at 694 (stating that to establish prejudice, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome").

evidence in this case was material, he cannot prevail on either his *Brady* claim or his claim of ineffective assistance of counsel.  Therefore, we affirm the result reached by the Court of Appeals.

Bridget M. McCormack
Robert P. Young, Jr.
Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
David F. Viviano