# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

RONALD ANTHONY DIMAMBRO, JR.,

Defendant-Appellant.

FOR PUBLICATION
December 6, 2016

No. 323251
Macomb Circuit Court
LC No. 2013-004215-FC

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellant,

v

RONALD ANTHONY DIMAMBRO, JR.,

Defendant-Appellee.

No. 332319
Macomb Circuit Court
LC No. 2013-004215-FC

Before: JANSEN, P.J., and MURPHY and RIORDAN, JJ.

JANSEN, P.J. (*dissenting*).

I respectfully dissent. I would reverse the trial court's order granting defendant's motion for a new trial and affirm defendant's convictions and sentences. I do not believe that a *Brady*[1] violation occurred in this case for two reasons. First, I do not believe that the medical examiner falls within the scope of the "government" for the purposes of determining whether the prosecution suppressed evidence. Second, I do not believe that the 32 photographs from the neurological portion of the autopsy were material.

---

[1] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

-1-

# I. SUPPRESSION OF EVIDENCE

As stated in the majority opinion, in order to establish a *Brady* violation, three elements must be established: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) viewed in its totality, is material." *People v Chenault*, 495 Mich 142, 155; 845 NW2d 731 (2014). With regard to the requirement that the prosecution suppressed evidence, our Supreme Court has explained that the government is responsible for evidence within its control, even if that evidence is unknown to the prosecution. *Id*. at 150. The United States Supreme Court has explained that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v Whitley*, 514 US 419, 437; 115 S Ct 1555; 131 L Ed 2d 490 (1995).

I disagree with the majority's conclusion that a medical examiner falls within the scope of the "government" for the purposes of establishing a *Brady* violation. My disagreement with the majority stems from the fact that a medical examiner has a separate set of duties, independent of the prosecution, to determine the cause and manner of suspicious deaths. Our Supreme Court has established that a county medical examiner's duties are owed to the state. See *Maiden v Rozwood*, 461 Mich 109, 132; 597 NW2d 817 (1999). The county medical examiners act, MCL 52.201 *et seq*., details the duties that a medical examiner owes to the state. Specifically, MCL 52.202 provides that a medical examiner or deputy medical examiner has a duty to investigate the cause and manner of a death under certain circumstances, including when "[t]he individual dies by violence," or "[t]he individual's death is unexpected." MCL 52.202(1). The county medical examiner is therefore required to investigate suspicious deaths and come to an independent conclusion on the cause and manner of death. The medical examiner is not under the control of the prosecution. Unlike with the police or other law enforcement agencies, the prosecution would not have any way of knowing if any documents created by the medical examiner were missing. Therefore, I conclude that the medical examiner is not within the same category as a police officer or other investigator working on behalf of the prosecution. See, e.g., *People v Stern*, 270 AD2d 118, 119; 704 NYS2d 569 (2000) (concluding that documents in the possession of the chief medical examiner could not be attributed to the prosecution because the medical examiner's office was not a law enforcement agency).[2]

The majority points out that the medical examiner may be required to testify on behalf of the state at trial. While it is true that "[a]ny and all medical examiners or their deputies *may* be required to testify in behalf of the state in any matter arising as the result of any investigation required under this act," MCL 52.212 (emphasis added), the medical examiner's duty is broader than simply obtaining evidence on behalf of the prosecution. MCL 52.212 provides that the medical examiner *may* be required to testify on behalf of the state, suggesting that the medical examiner is not bound to make findings regarding the cause and manner of death that are favorable to the prosecution, but rather, is required to testify on behalf of the prosecution when the medical examiner's testimony aligns with the prosecution's theory of the case. Accordingly,

---

[2] While cases from foreign jurisdictions are not binding on this Court, they may be persuasive. See *People v Daniels*, 311 Mich App 257, 268 n 4; 874 NW2d 732 (2015).

I conclude that a medical examiner does not constitute the "government" for the purposes of determining whether the prosecution suppressed evidence.

## II. MATERIALITY

I also disagree with the majority's conclusion that the 32 photographs were material. As outlined in the majority opinion, in order to establish that the evidence was material, "a defendant must show that 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Chenault*, 495 Mich at 150 (citation omitted). Further " '[a] "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " *Id*. (citation omitted). "The question is whether, in the absence of the suppressed evidence, the defendant 'received a fair trial, understood as a trial resulting in a verdict worthy of confidence.' " *Id*. at 150-151 (citation omitted).

First, Dr. Cassin's testimony regarding the effect of the surgical intervention on the right side of the child's head encompassed the testimony provided by Dr. Dragovic. At trial, Dr. Spitz opined that the injury to the child's brain was intentionally inflicted and that the manner of death was homicide. He explained during the course of discussing his autopsy findings that the bruising on the child's brain indicated that there was a direct injury to the brain underneath the area of impact. In other words, the bruising on the child's brain was the result of the forceful contact of the child's head with a nonyielding object. Dr. Spitz explained that he was aware that the child had undergone medical intervention, but explained that this did not affect his ability to determine the cause and manner of the child's death. In contrast, during the *Ginther*[3] hearing, Dr. Dragovic testified that the bruising on the child's brain was related to the surgical intervention following the incident and was not a direct result of the child's injury. Dr. Dragovic concluded that it was impossible to determine whether the injury was intentionally inflicted based solely on the nature of the injury.

Dr. Cassin also testified that the surgical intervention performed on the right side of the child's head made it difficult, if not impossible, to interpret the injury finding. Dr. Cassin noted in his report that "bruising was described in the scalp and on the right side of the brain," thus indicating that he was aware of the bruising on the child's brain. He testified, "Surgical intervention can significantly complicate the injury finding and make the interpretation of injury finding difficult, if not actually impossible, in some details." When pressed for additional details, Dr. Cassin clarified as follows:

> *Q*. Well, specifically, with this case, is there anything relevant with the surgical site or surgical intervention and the – I believe it's Dr. Sptiz's [sic] autopsy report indicating blood [sic] head trauma to the right side of the head.

> *A*. Yes, it did. And the surgical intervention that you mention also happened *on the right side of the head*. [Emphasis added.]

---

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

Thus, contrary to the majority's conclusion, Dr. Cassin *did* testify that the surgical intervention performed on the right side of the child's head complicated, or even rendered impossible, the interpretation of the child's injuries. While Dr. Cassin did not specifically opine regarding the effect of the surgical intervention on the cortex of the child's brain, his testimony regarding the effect of the surgical intervention broadly encompassed the entire right side of the head. The testimony effectively contained the same conclusion that Dr. Dragovic made during the *Ginther* hearing.

In fact, Dr. Dragovic testified to as much during the *Ginther* hearing, explaining that Dr. Cassin came to the same conclusion that he did regarding the surgical intervention, but did not have the photograph evidence to support his opinion:

> *Q*. Is there something that would change based on those 32 photos that you were given?
>
> All you're saying is he didn't have the 32 photos. Based on the 32 photos you have, what are you saying that's different than Dr. Cassin? What's [sic] what I'm asking you.
>
> *A*. I am saying that there is no evidence of brain contusion there; that the contusions are all the result of complications of surgical procedure. That's what I'm saying.
>
> *Q*. Isn't that exactly what Dr. Cassin testified to?
>
> *A*. It's pretty – that was his thought. Bus, he did not have anything to say here it is, here is the evidence.

Dr. Dragovic explained that although Dr. Cassin came to the same conclusion, Dr. Cassin lacked the photographic evidence to support his position, which caused Dr. Cassin to be "limited in his assessment." However, as even Dr. Dragovic recognized, Dr. Cassin's conclusion regarding the effect of the surgical intervention on the injury finding was essentially the same as Dr. Dragovic's testimony.

As noted by the majority, Dr. Cassin's testimony was similar to Dr. Dragovic's testimony in several other important respects. Both doctors testified that the injury was most likely the result of blunt force trauma stemming from the child's head hitting a nonyielding surface. Most notably, both medical examiners testified that it was not possible to determine from the nature of the injury whether the injury was intentionally inflicted. Thus, both experts ultimately came to the same conclusion regarding the manner of death. Dr. Cassin's testimony establishes that he provided the solid expert defense to which defendant was entitled. Accordingly, I do not believe that there is a reasonable probability that, had the photographic evidence been disclosed to the defense, the result of the proceeding would have been different.

I further disagree with the trial court's reliance on the testimony of Dr. Dragovic in determining that the 32 photographs were material. Dr. Dragovic did not testify at trial and was not otherwise involved in the case until after the trial concluded. Although the majority opinion

assumes that Dr. Dragovic would have testified at trial, or that another expert would have testified to the same conclusions regarding the photographs, defendant's trial attorney did not testify at the *Ginther* hearing that he would have sought to admit additional expert testimony as the result of receiving the 32 photographs. Dr. Dragovic's testimony, therefore, does not establish that the testimony presented *at trial* would have been different had the defense received the 32 photographs. I do not believe it is proper for the trial court to consider the opinion of an expert who was not involved in the original case. It is possible for the defense in any case, once the trial is complete, to find an expert whose testimony is at variance with the expert testimony presented at trial. Therefore, I believe it is improper to consider the opinion of an expert who was not involved in the original trial.

Furthermore, neither Dr. Cassin nor Dr. Spitz testified at the *Ginther* hearing regarding the effect that the 32 photographs would have had on their testimony. Without the testimony of Dr. Cassin at the *Ginther* hearing, it is impossible to determine whether he would have referred to the 32 photographs as additional support for his conclusions regarding the effect of the surgical intervention on the child's head or whether he would have come to the same conclusion as Dr. Dragovic regarding the significance of the 32 photographs. Additionally, approximately 290 photographs *were* provided to the defense before trial. The evidence provided to the defense was sufficient for Dr. Cassin to form an opinion on behalf of the defense. Therefore, the evidence that was provided to the defense diminishes the materiality of the 32 additional photographs.

Finally, I believe that these 32 photographs cannot be viewed in isolation from the other evidence of guilt presented by the prosecution. Instead, I believe that it is necessary to examine the additional testimony and evidence presented at trial in order to determine whether the 32 photographs were material.

Additional testimony was presented at trial on behalf of the prosecution. For example, defendant's 10-year-old niece testified that defendant shook the child on occasion, slapped the child, and told his niece that he hated the child and wished the child would die. Further, the parties do not contest the fact that defendant was watching the child during the time leading up to the child's death and was left alone with the child. According to the child's mother, the child was acting normal when the child's mother left him that afternoon in defendant's care.

Defendant did not provide a concrete explanation for the child's death. Instead, the prosecution presented at trial the videotape of defendant's highly incriminating police interview, in which defendant initially stated that the child went limp after defendant left him alone in his play pen. According to defendant's initial story, the child was fine when defendant placed him in the play pen, but was symptomatic almost immediately after defendant removed him from the play pen. During the course of the police interview, defendant admitted to hitting the child in the head with a ball while playing catch during the time that he was watching the child. He then added that the child fell out of his arms and hit his head while defendant was holding him. He finally admitted that he shook the child for up to 30 seconds because the child was crying. Defendant's constant alterations to his story and his admission that he shook and dropped the child bolsters the prosecution's argument that defendant intentionally caused the child's injuries.

Additionally, Dr. Angelilli, who testified as an expert in pediatrics and child abuse, opined that the child's injuries were nonaccidental and were intentionally inflicted. She testified that the explanations for the injury provided by the defense, such as the child falling off of a bar stool or falling out of defendant's arms, would have resulted in less severe injuries. She also explained that the child would have been symptomatic immediately following the fatal injury. Importantly, Dr. Angelilli testified as follows:

*Q.* Now, Doctor, in your opinion, as an expert in the field of pediatrics and child abuse, what is your opinion in this case?

*A.* I think that Damien was abused. I think this is child abuse.

*Q.* And you've already stated non-accidental inflicted trauma.

*A.* Yes, and I'm actually certain of that.

Thus, Dr. Angelilli's testimony provided an independent basis for the jury to find that defendant abused the child, resulting in the fatal injury.

The majority notes in a footnote that Dr. Dragovic's testimony indirectly challenges the validity of Dr. Angelilli's conclusions, but also acknowledges that Dr. Angelilli's conclusions were not based on the appearance of the brain. I fail to see how Dr. Dragovic's testimony regarding the 32 photographs challenges the validity of Dr. Angelilli's testimony. As the majority acknowledges, Dr. Angelilli did not rely on the appearance of the child's brain in rendering her opinion. Dr. Angelilli's expert testimony also did not rely on Dr. Spitz's autopsy report. Accordingly, I conclude that Dr. Dragovic's testimony regarding the 32 photographs does not affect the validity of Dr. Angelilli's opinion.[4] Dr. Angelilli's expert testimony, therefore, provided an additional basis for the jury to conclude that defendant intentionally caused the fatal injury.

In light of the additional incriminating evidence presented at trial, I do not believe that there is a reasonable probability that, had the prosecution disclosed the photographs to the defense before trial, the result of the proceeding would have been different. Put another way, in the absence of the 32 photographs, defendant received a trial resulting in a verdict worthy of confidence. Therefore, I conclude that there was no *Brady* violation in this case because the medical examiner did not constitute the "government" for the purposes of establishing whether the prosecution suppressed evidence, and the 32 photographs were not material. I would reverse

---

[4] To the extent that the majority implies that Dr. Dragovic's conclusion regarding the manner of death was contrary to Dr. Angelilli's conclusion that the injury was intentionally inflicted, Dr. Cassin came to the same conclusion as Dr. Dragovic regarding the manner of death, and Dr. Angelilli's opinions were therefore refuted by Dr. Cassin's testimony.

the trial court's order granting defendant a new trial and affirm defendant's convictions and sentences.


/s/ Kathleen Jansen