# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

CLARENCE MCMILLEN, JR.,

      Defendant-Appellant.

UNPUBLISHED
August 24, 2017

No. 332089
Wayne Circuit Court
LC No. 15-005091-01-FC

Before: GADOLA, P.J., and METER and FORT HOOD, JJ.

PER CURIAM.

This case arises out of defendant's sexual assault of the daughter of his former girlfriend while the victim, defendant's former girlfriend, and her three younger children were staying at defendant's home. The victim testified that the assault occurred one night after she fell asleep while watching a movie in defendant's bedroom. At trial, a jury convicted defendant of three counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(b)(*i*). The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to 30 to 45 years' imprisonment for each CSC-I conviction. Defendant appeals as of right. We affirm.

## I. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that the prosecution failed to sufficiently prove that he and the victim were members of the same household pursuant to MCL 750.520b(1)(b)(*i*). We review de novo challenges to the sufficiency of the evidence. *People v McGhee*, 268 Mich App 600, 622; 709 NW2d 595 (2005). When reviewing a sufficiency claim, we view the evidence adduced at trial "in the light most favorable to the prosecutor and determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015). The standard of review is deferential; reviewing courts must draw all reasonable inferences and credibility determinations in support of the verdict. *Id*. The prosecution need not negate every reasonable theory of innocence, but must convince the jury of a defendant's guilt in the face of any contradictory evidence provided by the defense. *Id*. Circumstantial evidence and the reasonable inferences arising from that evidence can constitute satisfactory proof of a crime. *Id*.

Defendant was convicted of three counts of CSC-I under MCL 750.520b(1)(b)(*i*), which provides that a "person is guilty of criminal sexual conduct in the first degree if he . . . engages in sexual penetration with another person," and that other person is "at least 13 but less than 16

-1-

years of age," and "the actor is a member of the same household as the victim." In *People v Phillips*, 251 Mich App 100, 103; 649 NW2d 407 (2002), this Court analyzed the meaning of the term "household" as used in MCL 750.520b(1)(b)(*i*), and stated the following:

> [T]he term "household" has a fixed meaning in our society not readily susceptible of different interpretation. The length of residency or the permanency of residency has little to do with the meaning of the word as it is used in the statute. Rather, the term denotes more of what the Legislature intended as an all-inclusive word for a family unit residing under one roof for any time other than a brief or chance visit. [Quotation marks and citation omitted.]

In this case, the evidence presented at trial was sufficient to allow a rational jury to conclude beyond a reasonable doubt that defendant, his former girlfriend, and her children, including the victim, were operating as a "family unit" for longer than a "brief or chance visit" at the time of the assault. Testimony at trial showed that defendant's former girlfriend and her four children moved into defendant's home in April 2015. Defendant and the victim's mother had been dating on and off for 11 years, and she claimed that defendant was the father of her three youngest children. Testimony established that defendant's former girlfriend and her children had been staying at defendant's home for about one month before the assault occurred. Defendant's former girlfriend testified that, during this month, she purchased groceries for everyone, including defendant, and would cook, clean, and wash everyone's clothing. Defendant watched the children while his former girlfriend worked from 8:00 a.m. to 4:00 p.m., and he had authority to discipline the children while he was with them. Although defendant was not the victim's father, she testified that they had a close relationship and she considered defendant to be her stepfather. The victim testified that she felt she could talk to defendant in ways that she could not talk to her mother. Viewing this evidence in a light most favorable to the prosecution, a rational trier of fact could find beyond a reasonable doubt that defendant and the victim were members of the same household at the time of the sexual assault. Therefore, the prosecution presented sufficient evidence to support defendant's convictions of CSC-I under MCL 750.520b(1)(b)(*i*).

## II. THE PROSECUTOR'S CONDUCT

In his Standard 4 brief, defendant argues that the prosecution violated *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), by withholding hospital treatment notes and a report from the Department of Health and Human Services (DHHS), which defendant claims he could have used to impeach the testimony of the victim and his former girlfriend. Defendant also argues that, based on the information contained in the report and treatment notes, the prosecution knowingly used perjured testimony to secure his convictions at trial. Defendant did not raise any issues regarding the prosecution's alleged *Brady* violation or use of perjured testimony in the trial court, so we review these unpreserved issues for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

To establish a *Brady* violation, a defendant must prove "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014) (quotation marks and citation omitted). Evidence is favorable to a defendant if it is exculpatory or can be used for impeachment. *Id.*

"To establish materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quotation marks and citation omitted). The ultimate question is whether, in the absence of the suppressed evidence, the defendant received a trial resulting in a verdict worthy of confidence. *Id.* at 150-151.

A conviction obtained through the prosecution's knowing use of false testimony violates a defendant's due process rights and must be set aside if there is a reasonable likelihood that the false testimony could have affected the jury's judgment. *People v Aceval*, 282 Mich App 379, 389; 764 NW2d 285 (2009). "Stated differently, a conviction will be reversed and a new trial will be ordered, but only if the tainted evidence is material to the defendant's guilt or punishment." *Id.* The crucial inquiry for due process purposes is whether the perjured testimony affected the fairness of the trial; the focus is not on the prosecution's culpability. *Id.* at 390.

Defendant argues that the victim's trial testimony concerning the nature of the assault was inconsistent with statements she made to DHHS and hospital personnel, as reflected by a DHHS report and hospital treatment notes. Specifically, defendant argues that the victim reported that defendant assaulted her only with his penis and finger, but she "made no claim that she was assaulted with [defendant's] tongue," as she testified to at trial. Contrary to defendant's assertion on appeal, the DHHS report indicates that the victim reported "vaginal penetration with [defendant's] finger and penis" and that defendant "also . . . licked [the victim's] vagina." The hospital treatment notes state that the victim reported that "there was penetration but no trauma and [defendant] did not ejaculate[.]" The fact that the treatment notes do not specify the type or types of penetration does not make the victim's trial testimony inconsistent with her statements to hospital personnel. Therefore, even assuming the prosecution improperly withheld the DHHS report and hospital treatment notes, defendant has not shown that this evidence could have been used to impeach the victim's testimony in this regard. Likewise, defendant has not shown that the prosecution knowingly used false testimony on this point to obtain defendant's convictions.

Defendant also argues that his former girlfriend testified at trial that he was the father of her three youngest children, but she reported to DHHS that he was only the father of her youngest child. He likewise points out that the victim testified at trial that he was the father of her three siblings. The DHHS report indicates that defendant's former girlfriend and an "unknown father" are the parents of the three oldest children and that defendant is the father of the youngest child, without attributing a source for this information. The report also states that Child Protective Services interviewed defendant's former girlfriend and she stated that "her children identify [defendant] as their father," but then stated that "she has no contact with the father of her children and he may be deceased." Given the lack of clarity surrounding these statements, the DHHS report has minimal value as a tool of impeachment with regard to defendant's former girlfriend[1] and no impeachment value with regard to the victim because none of the statements in the report can be fairly attributed to her. Moreover, even assuming the

---

[1] See also MRE 608(b) ("Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility . . . may not be proved by extrinsic evidence.").

prosecution suppressed the DHHS report and offered the testimony of the victim and defendant's former girlfriend on this point knowing that respondent was not the father of two of the non-victim children, the paternity of the non-victim children was not an issue central to defendant's guilt or innocence. Contrary to defendant's assertion on appeal, his paternity of the non-victim children, or lack thereof, would not alter the household element of CSC-I under MCL 750.520b(1)(b)(*i*). Additionally, defendant's attorney strongly implied during cross-examination of defendant's former girlfriend that she may have been lying about the paternity of two of the non-victim children, and his attorney impeached the victim's testimony regarding numerous other details surrounding the assault. Furthermore, physical DNA evidence corroborated the victim's account. Under the circumstances, defendant cannot show with a reasonable probability that the prosecution's use of the allegedly tainted testimony or the non-disclosure of the DHHS report affected the outcome of the proceedings.[2] See *Aceval*, 282 Mich App at 389; *Chenault*, 495 Mich at 150.

## III. DNA EVIDENCE

Defendant next argues in his Standard 4 brief that he is entitled to a new trial because the expert DNA testimony proffered by the prosecution did not comply with the requirements set forth in *People v Coy*, 243 Mich App 283; 620 NW2d 888 (2000). Defendant also argues that he is entitled to a new trial because the Michigan State Police (MSP) Crime Lab created his DNA profile before he provided a DNA sample via buccal swab. Therefore, defendant argues, the DNA profile matching the male DNA in the victim's underwear could not have come from defendant. We disagree.

Defendant failed to object to the admission of the DNA evidence presented at trial and failed to contest the source of the DNA sample attributed to him and used in comparison to the male DNA found in the victim's underwear. This issue is therefore unpreserved. *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). We review unpreserved evidentiary issues for plain error affecting a defendant's substantial rights. *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014).

Relying on this Court's opinion in *Coy*, defendant argues that the testimony of Brian Schloff, a forensic scientist with the MSP Crime Lab who was certified as an expert in DNA analysis and biology, did not provide "any accompanying statistical evidence, or supportive

---

[2] Defendant briefly mentions in his Standard 4 brief that "[t]he prosecution also knew that [the victim] had discussed the assault with other individuals after her contact with Kids Talk." He provides no context, argument, or record citation in connection with this statement, therefore abandoning any error regarding this point on appeal. See *People v McMiller*, 202 Mich App 82, 83 n 1; 507 NW2d 812 (1993). The prosecution notes in its appellate brief that the victim testified at trial that the last person she talked to about the case was someone at Kids Talk, which her mother said took place on May 4, 2015, while the DHHS report contains a brief account of the assault, ostensibly relayed by the victim, dated May 5, 2015. Given the minor nature of this discrepancy involving an issue that was not central to defendant's guilt or innocence, defendant has not shown that the fairness of his trial was affected by this testimony.

qualitative or quantitative evidence of any kind," to demonstrate that the DNA profile developed by the MSP Crime Lab actually matched defendant's DNA. In *Coy*, 243 Mich App at 302, this Court concluded that certain DNA evidence was inadmissible under MRE 702 and MRE 403. A serologist testified regarding a potential DNA match between the defendant's DNA and DNA found in a mixed blood sample from a knife and a doorknob recovered from the crime scene. *Id*. at 292-294. The serologist testified that neither the defendant nor the victim could be excluded as contributors to the samples, but explained that she did not perform any "statistical interpretation of the results . . . achieved regarding the mixed DNA samples recovered from the knife blade and the doorknob . . . ." *Id*. at 293-294. This Court held that "absent some analytic or interpretive evidence concerning the likelihood or significance of a DNA profile match, . . . testimony concerning the potential match between [the] defendant's DNA and the DNA contained in the mixed blood samples found on the knife blade and the doorknob was insufficient to assist the jury in determining whether [the] defendant contributed DNA to the mixed sample." *Id*. at 301. This Court expressly declined, however, to "declare or delineate the appropriate articulations for expressing the extent or meaning of a potential match, but merely [held] that some qualitative or quantitative interpretation must accompany evidence of the potential [DNA] match." *Id*. at 302.

At trial, Schloff testified regarding the DNA analysis he performed and explained that he obtained two types of DNA from a cutting of the victim's underwear: an epithelial fraction and a sperm fraction. He then testified as follows:

> [*Schloff*]. [T]he DNA profile that was obtained from the epithelial fraction of the underwear is consistent with being a mixture of the victim in this case . . . and one male contributor. . . . [T]he DNA that was developed from [defendant's] reference sample matched that additional donor to the epithelial fraction of the underwear cutting.
>
> [*The Prosecution*]. Absence of identical twins or close relative; is that correct?
>
> *Schloff*. Yes.
>
> *The Prosecution*. So basically unless he's got a twin—or when you say close relative how is that defined?
>
> *Schloff*. Well, close the bottom line is that with a good degree of scientific certainty the DNA from that additional donor does match [defendant]. The close relative reference is if there were a brother with very very similar DNA or sibling or . . . something like close relative: mother, father or son or daughter may have some DNA that's similar, but the DNA from this profile still matches his profile.
>
> * * *
>
> *Schloff*. [A]nd with a reasonable degree of scientific certainty [the] DNA from the sperm fraction of the underwear cutting and from the reference sample from [defendant] are from the same individual. They do match.

-5-

*The Prosecution.* So two different profiles developed?

*Schloff.* So the first profile which was from the epithelial fracture is a mixture of two individuals. In other words, two people contribute to that DNA profile, and in that case it appears to be a mixture of [the victim's DNA] and [defendant's DNA]. And the sperm fraction of the underwear cutting is a single person, and it matches the DNA from [defendant].

Based on the foregoing, Schloff's expert opinion that defendant's DNA was found in a cutting of the victim's underwear was accompanied by a sufficient interpretive framework to assist the jury. Schloff provided the jurors with a qualitative analysis of the likelihood that the DNA found in the victim's underwear belonged to defendant by speaking in terms of a "reasonable" or a "good" degree of scientific certainty and by explaining the limited circumstances that could provide a false match, i.e., the presence of a twin or a close relative. Accordingly, unlike the DNA expert in *Coy*, Schloff provided analytic and interpretive evidence concerning the significance of the DNA profile match sufficient to assist the jury in determining whether defendant contributed to the DNA obtained from the cutting of the victim's underwear. Therefore, defendant has not shown that admission of this DNA evidence amounted to plain error affecting his substantial rights.

Defendant next argues that the buccal swab reference sample used by the MSP Crime Lab did not come from him because the MSP laboratory report lists a "Date Received" as May 13, 2015, while the police did not obtain a search warrant for defendant's buccal swab until June 24, 2015. Detroit Police Officer Elaine Caldwell of the Special Victims Unit, and officer in charge of the case, testified that she obtained a warrant for defendant's buccal swab on June 24, 2015, and thereafter obtained a buccal swab from defendant, sealed the swab in two envelopes, and sent it to the MSP Crime Lab. Caldwell testified that defendant signed the envelope containing his buccal swab. Schloff testified that he received two evidence containers for analysis in this case, one which held the "evidence collection kit that was submitted as collected" from the victim, and one which held "a sealed envelope that contained a reference sample reportedly collected from" defendant. Schloff testified that the envelope was marked with defendant's name and an identification number; he could not recall whether he received all of the DNA swabs together at one time. The MSP laboratory report does not specify that the "Date Received" pertains to all of the samples analyzed within the report, as opposed to merely the first evidence samples received by the MSP Crime Lab. The laboratory report also lists the "Date Completed" as September 14, 2015, well after the time defendant supplied his buccal swab for analysis. Under the circumstances, defendant has not shown that the buccal swab analyzed by the MSP Crime Lab was not properly authenticated or was obtained from someone other than defendant himself. The trial court did not plainly err by admitting this evidence at trial.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, in his Standard 4 brief, defendant argues that his trial counsel provided ineffective assistance because his attorney did not object "[w]hen the prosecutor solicited testimony from his DNA expert without accompanying statistical analysis or evidence," and "failed to effectively contest admitted DNA evidence received and tested by [the] State Police on [5]/13/15; in light of Defendant's DNA buccal swab not being obtained until . . . 6/24/[15]."

Whether a defendant has been denied the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v Solloway*, 316 Mich App 174, 187; 891 NW2d 255 (2016). We review for clear error a trial court's findings of fact and review de novo questions of law. *Id.* at 188. When no evidentiary hearing has been conducted to develop a factual record regarding an ineffective assistance claim, as is the case here, our review is limited to mistakes apparent on the record. *Id.*

"Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012). To establish a claim of ineffective assistance, a defendant must prove that "(1) counsel's performance was deficient, meaning that it fell below an objective standard of reasonableness, and (2) but for counsel's error, there is a reasonable probability that the outcome of the defendant's trial would have been different." *Solloway*, 316 Mich App at 188.

As discussed earlier in this opinion, Schloff provided a sufficient analytic and interpretive framework to assist the jury in determining whether defendant contributed to the DNA obtained from the cutting of the victim's underwear, and there is no evidence in the record suggesting that the buccal swab used by the MSP Crime Lab for reference came from anyone other than defendant. Any objection by defense counsel regarding these two instances of alleged error would have been futile. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Accordingly, defendant has not shown that his trial counsel provided ineffective assistance.

Affirmed.

/s/ Michael F. Gadola
/s/ Patrick M. Meter
/s/ Karen M. Fort Hood