# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JONATHON LOYD EDICK,

Defendant-Appellant.

UNPUBLISHED
February 15, 2018

No. 335966
Kalamazoo Circuit Court
LC No. 2016-000320-FH

Before: MARKEY, P.J., and M. J. KELLY and CAMERON, JJ.

PER CURIAM.

Defendant appeals by right his jury trial convictions of first-degree home invasion, MCL 750.110a(2); third-degree criminal sexual conduct, (CSC-III), MCL 750.520d(1)(b) (force or coercion); unlawful imprisonment, MCL 750.349b; and domestic violence, MCL 750.81(2). Defendant was sentenced as a fourth-offense habitual offender, MCL 769.12, to a mandatory 25 to 50 years' imprisonment for each of the four convictions pursuant to MCL 769.12(1)(a). We affirm.

## A. FACTS

Defendant's convictions arise out of a home invasion and sexual assault of defendant's former girlfriend, MV, on February 22, 2016. MV testified that the relationship ended on February 17, 2016. During the days after the breakup, defendant and MV communicated by cellular telephone and a messenger application called Hangout. MV explained that defendant sent her threatening messages and made a phone call in which he threatened to kill her and her three children; defendant also threatened to ruin MV's life and break her possessions. MV asked Officer Adam Dmoch, an acquaintance, questions about personal protection orders (PPO), and Officer Dmoch informed MV that she should report all threats to the proper authorities.

MV testified that during the evening hours of February 22, 2016, she received text messages from defendant asking her what she was doing and whether she invited another man into her home. MV responded "no" and indicated that she wanted to be left alone. MV testified that after she was in bed, she heard a noise from a window in the kitchen area of her apartment. MV got out of bed and walked toward the kitchen; defendant entered the apartment through a window. He ignored MV when she told him to leave. Defendant proceeded to walk upstairs and

look in each of the bedrooms and bathroom. MV testified that defendant used his body to "grab" her; she described the physical contact as "kind of like a big hug but my arms were down." MV explained that her arms were pinned to her sides and that defendant lifted her up and "walked me into my bedroom in his arms into my bedroom and laid me down on my bed." Defendant laid MV on the bed "with his body," and he initially lay on top of MV. MV said that she struggled to get defendant off her; she told defendant to "stop," and she asked him to leave. At some point, MV and defendant were lying side-by-side on the bed, but defendant continued to hold MV down with his arms, and he used his leg to hold her lower body down.

MV testified that although defendant repeatedly asked her to have sex with him, she refused and said "no" and "not interested" 10 or 15 times. MV explained that defendant began to forcefully remove her clothes and also his own. MV stated that she eventually "just gave in" and was unable to get up or get away from defendant. MV testified that she felt trapped and if she tried to move, "he'd grab me." Defendant was "hovering over" MV, and he forced his penis into her vagina for about 8-10 minutes until he ejaculated. After defendant was finished, he got up and left the apartment. On cross-examination, MV testified that defendant also performed cunnilingus on her.

MV testified that she did not contact the police immediately after the assault out of concern that Child Protective Services (CPS) would become involved because her children were present in the home at the time of the assault. MV agreed that CPS previously became involved following an assault that defendant perpetrated against her in 2014. Specifically, MV testified that on one occasion while she was driving her vehicle and defendant was a passenger. While she and defendant were involved in a disagreement, defendant reached over and pulled her hair, punched her in the arm, and tried to grab the steering wheel.

On February 25, 2016, MV went to the sheriff's department with her sister to report the incident. Deputy Jeremy Kline completed a report, but MV only reported that defendant made threatening telephone calls; she did not report an assault or a home invasion. MV explained that she did not report the assault or home invasion to Deputy Kline because his demeanor was "cold," and he kept "shutting me down."

On Monday, February 29, 2016, MV disclosed the assault to a coworker who escorted her to the YWCA where she reported the assault to staff and then to Deputy Juan Johnson. Deputy Johnson went to MV's apartment and observed a fingerprint on a window at the apartment; it appeared as if someone tampered with the window and "popped it from the track."

The trial court admitted other-acts evidence at trial. Specifically, JP, defendant's former wife, testified about an incident in which defendant entered her home unannounced and physically assaulted her. JP testified that after the divorce, on the morning of May 6, 2013, when defendant and JP were no longer living together, defendant appeared at JP's home near her bedroom window. Defendant entered JP's home through the side door. Defendant instructed JP's young child to go into a bedroom, and then he forced JP into her bedroom. JP testified that defendant "pinned" her onto her bed and tried to convince her to have sex, but she refused. Defendant pulled JP's pants down to her ankles, but he ultimately stopped and left the home.

Defendant testified in his own defense and denied that he assaulted MV. Instead, according to defendant, he and MV were still in a relationship, MV invited him over to her apartment, and then they had consensual sex.

The jury convicted defendant, and the trial court sentenced him as set forth above. Defendant now appeals.

B. ANALYSIS

I. HABITUAL OFFENDER ENHANCEMENT/SCORING OF OVS

Defendant argues that the trial court erred in imposing a mandatory 25-year minimum sentence under MCL 769.12(1)(a). In a Standard 4 brief, defendant also argues that the prosecution failed to timely file the notice of its intent to seek the enhancement.

Whether defendant was subject to the fourth-offense habitual offender, enhancement under the applicable statutory provision necessarily involves an issue of statutory interpretation, which we review de novo. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). Similarly, we review de novo whether the prosecutor complied with the applicable court rule. See *Hinkle v Wayne Co Clerk*, 467 Mich 337, 340; 654 NW2d 315 (2002). Unpreserved nonconstitutional errors are reviewed for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

(1) NOTICE OF ENHANCEMENT

In this case, the felony complaint issued on March 3, 2016, and defendant was arraigned *on the warrant* on that same day, March 3, 2016. On March 23, 2016, the trial court held the preliminary examination, and defendant was bound over to the circuit court following the hearing. Thereafter, on March 28, 2016, the prosecution filed the information and, on that same day, filed the notice of intent to seek an habitual offender fourth-offense enhanced sentence. Defendant argues that the prosecution failed to file the notice within 21 days after the *arraignment on the warrant* and therefore failed to comply with MCR 6.112(F). Defendant's argument fails because he fails to recognize the distinction between the initial arraignment on the complaint or warrant, MCR 6.104, and a subsequent arraignment on a felony information filed in circuit court, MCR 6.113.

MCL 769.13 governs the notice procedures for seeking an enhanced sentence for habitual offenders under MCL 769.12, and it provides that the prosecuting attorney must file "a written notice of his or her intent to do so w*ithin 21 days after the defendant's arraignment on the information* charging the underlying offense or, if arraignment is waived, within 21 days after the filing of the information charging the underlying offense." (Emphasis added). MCR 6.112(F) similarly provides "[t]he notice must be filed within 21 days after the defendant's arraignment on the information charging the underlying offense or, if arraignment is waived . . . within 21 days after the filing of the information charging the underlying offense."

In this case, the prosecution filed the information and the habitual notice on the same day—March 28, 2016, thereby complying with the 21-day notice requirement set forth above.

The only indication regarding an arraignment on the information is an entry on the circuit court docket sheet indicating the filing of an "Arraignment Report" on April 25, 2016. Whether the trial court held the arraignment on that date or whether defense counsel waived the arraignment on the information, the prosecutor filed the enhancement notice within 21 days of the waiver or arraignment because the information and notice were filed on the same day, March 28, 2016. MCL 769.13; MCR 6.112(F). There was no error.

## (2) MANDATORY MINIMUM 25-YEAR SENTENCE

Next, defendant argues that the trial court erred in sentencing him as an habitual offender, fourth offense, to a minimum 25-year sentence under MCL 769.12(1)(a), which provides:

> (1) If a person has been convicted of any combination of 3 or more felonies or attempts to commit felonies . . . and that person commits a subsequent felony within this state, the person shall be punished upon conviction of the subsequent felony and sentencing under section 13 of this chapter as follows:

> (a) *If the subsequent felony is a serious crime . . . and 1 or more of the prior felony convictions are listed prior felonies*, the court shall sentence the person to imprisonment for not less than 25 years. Not more than 1 conviction arising out of the same transaction shall be considered a prior felony conviction for the purposes of this subsection only. [Emphasis added.]

In this case, all of the requirements under MCL 769.12(1)(a) for a mandatory 25-year minimum were satisfied. First, defendant's presentence investigation report (PSIR) shows that defendant was previously convicted of the following three felony offenses in separate transactions: (1) fleeing or eluding a police officer, second degree, MCL 257.602a(4)(a); (2) assaulting or resisting or obstructing a police officer, MCL 750.81d(1); and (3) breaking and entering a building with intent to commit a felony, MCL 750.110.

Second, at least one of these prior felony convictions was a "listed prior felony," for purposes of MCL 769.12(1)(a). Specifically, defendant's conviction of violating MCL 257.602a(4)(a) (fleeing or eluding a police officer, second degree), constitutes a "listed prior felony" under MCL 769.12(6)(a)(*i*).

Third and finally, defendant committed a subsequent felony, CSC-III, MCL 750.520d, is a "serious crime," for purposes of MCL 769.12(1)(a). See MCL 769.12(6)(c).

In sum, defendant had a combination of three prior felony convictions, one for a "listed prior felony" under MCL 769.12(6)(a)(*i*), and defendant was subsequently convicted of CSC-III, a subsequent felony that is a "serious crime," under MCL 769.12(6)(c). Accordingly, the trial court did not err in imposing the 25-year minimum sentence mandated by MCL 769.12(1)(a).

Defendant also argues that the trial court erred in scoring several of the sentence guidelines offense variables (OVs). But given our conclusion that the trial court properly sentenced defendant to a mandatory 25-year minimum sentence under MCL 769.12(1)(a), defendant's arguments are without merit. Defendant's minimum sentence was mandated by statute; the guidelines' minimum recommended sentence range had no impact on defendant's

sentence, and an error in the scoring would not warrant any relief. *Id*. Therefore, we decline to address defendant's arguments. See MCL 769.34(2) (indicating that where a statute mandates a minimum sentence, a sentencing court must impose that sentence).

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, defendant raises several claims of ineffective assistance of counsel in his brief submitted by appellate counsel and in his Standard 4 brief.

Whether defendant was denied the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 578; 640 NW2d 246 (2002). A trial court's findings of fact, if any, are reviewed for clear error, while constitutional issues are reviewed de novo. *Id*. at 579. In cases such as the instant case in which there was no evidentiary hearing held in the lower court, our review is limited to mistakes apparent on the record. *People v Hurst*, 205 Mich App 634, 641; 517 NW2d 858 (1994).

To establish ineffective assistance of counsel, a defendant must show that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

Defendant argues that defense counsel was ineffective during the pretrial evidentiary hearing when the trial court considered whether to admit JP's testimony concerning defendant's other bad acts. Defendant argues that counsel failed to adequately challenge JP's credibility at the evidentiary hearing. Defendant notes that he took and passed a polygraph and that both JP and MV were friends, "each with an axe to grind."

Initially, we note that the "bright-line rule that evidence relating to a polygraph examination is inadmissible is well established." *People v Jones*, 468 Mich 345, 355; 662 NW2d 376 (2003). Defendant therefore cannot show that counsel acted deficiently in failing to introduce evidence of a polygraph exam during the evidentiary hearing. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").

With respect to counsel's cross-examination of JP, we reiterate that "[d]ecisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). At the hearing in this case, defense counsel cross-examined JP regarding the nature of her relationship with defendant, asked about whether JP had a relationship with MV, and questioned JP regarding whether there were charges pending against JP on the date that defendant entered her apartment and physically assaulted her. Defense counsel also questioned JP about whether she discussed the pending charges against defendant. In doing so, defense counsel challenged the admissibility of JP's testimony in a manner that he deemed most

appropriate, and we will not second-guess counsel's choice regarding the most effective line of questioning. See *id.*

Next, defendant argues that defense counsel was deficient in failing to object to the mandatory minimum 25-year sentence and in failing to object to the scoring of OVs 8, 10, and 11. But we have concluded the trial court did not err when imposing sentence. So, counsel was not deficient in failing to raise these objections. See *Ericksen*, 288 Mich App at 201.

Next, in a Standard 4 brief, defendant argues multiple claims of ineffective assistance of counsel. In Standard 4 Issue IV, defendant argues that counsel was ineffective when he failed to impeach and failed to subpoena JP's probation officer "to testify to her multiple violations for [harassing] defendant." Defendant also contends that counsel should have introduced a prior police report or a conviction against JP.

"Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *Davis*, 250 Mich App at 368. In this case, as discussed above, defense counsel's questioning of JP at the evidentiary hearing did not amount to deficient performance. Similarly, defense counsel's cross-examination at trial did not amount to deficient performance. Counsel questioned JP about the criminal complaint that defendant filed against her for home invasion, and JP agreed that she was prosecuted for the home invasion. JP also agreed CPS became involved with her at some point. Thus, defense counsel apprised the jury that JP had charges pending against her at the time of the incident involving defendant and that JP was involved with CPS at the time. Thus, introduction of the police report or an official conviction would have merely been duplicative evidence because JP admitted that she was prosecuted for the home invasion. Counsel's cross-examination was not deficient.

Defendant's argument that defense counsel should have called JP's probation officer to testify about incidents where JP allegedly harassed defendant, also lacks merit. Counsel failing to call a witness may be ineffective assistance when it denies the defendant a substantial defense, one that might have resulted in a different outcome at trial. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009); *People v Kelly*, 186 Mich App 524, 526; 465 NW2d 569 (1990).

In this case, defendant cannot show that failure to call JP's probation officer was outcome determinative. Defendant does not attach affidavits to indicate what the proposed testimony would be; however, even assuming that the officer would have testified that JP previously harassed defendant, such testimony would not have amounted to a defense that likely would have made a difference in the outcome of the trial. Specifically, defense counsel's cross-examination of JP showed that she and defendant had a tumultuous relationship, and JP admitted that she was prosecuted for an incident involving home invasion of defendant's home. JP also admitted that she was involved with CPS and that there were CPS complaints filed against her. Thus, the jury was aware that JP had a bad relationship with defendant, and defense counsel effectively advanced the defense theory that JP had motive to lie about defendant. Testimony of the probation officer would not have substantially advanced this defense theory, and defendant therefore cannot show that failure to call the officer denied him a substantial defense or amounted to deficient performance. See *Payne*, 285 Mich App at 190. Defendant has failed to

-6-

overcome the presumption that defense counsel's strategy involving JP fell below an objective standard of reasonableness. See *Davis*, 250 Mich App at 368-369.

Next, in Standard 4 brief, defendant raises a list of instances regarding defense counsel's allegedly deficient cross-examination of MV and his alleged failure to impeach MV. Defendant's arguments lack merit.

In this case, during cross-examination, defense counsel questioned MV about the general inconsistencies in her interactions with the police and her testimony at the preliminary examination. Specifically, counsel questioned MV as to why she failed to report the assault to Deputy Kline, he questioned her about why she failed to contact police to obtain a PPO, and he questioned her about her inconsistencies with respect to her testimony about oral sex. MV admitted that she reported the oral sex to a police officer and admitted that she failed to testify during direct examination that defendant performed cunnilingus on her. Counsel also questioned MV about the inconsistencies between her testimony at the preliminary examination and at trial regarding her interactions with Officer Dmoch.

Additionally, defense counsel presented the preliminary examination transcript to MV so she could refresh her recollection, and he questioned her about the inconsistency between that testimony and the testimony she offered at trial, and MV admitted that "its possible" her preliminary examination testimony was incorrect. Furthermore, defense counsel cross-examined Officer Dmoch, and he affirmed that he spoke with MV on February 20, not on February 27, which highlighted MV's inconsistency for the jury.

In short, defense counsel explored credibility issues with MV, and the jury was free to believe or disbelieve any or all of the victim's trial testimony. *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008). Defendant has failed to show that counsel's cross-examination of MV fell below an objective standard of reasonableness.

Next, defendant argues that counsel was deficient with respect to MV's testimony that defendant broke a key off in the lock on the exterior door to her apartment. However, defense counsel cross-examined MV about the key's being stuck in the door; he questioned her about whether she reported the broken key to anyone, and why she failed to report the broken key to maintenance or police. Moreover, MV testified that the door locked from the inside, and on the night of the incident, MV was at home. Therefore, defendant's argument regarding his ability to enter through the door as opposed to the window lacks merit. Furthermore, Johnson testified that he observed marks on the window that appeared to show that someone tampered with the window. Thus, any inconsistency of MV's preliminary examination and trial testimony regarding the broken key was not significant and would not have made a difference at trial. Defendant has failed to show that counsel's performance with respect to the key fell below an objective standard of reasonableness. See *Trakhtenberg*, 493 Mich at 51.

Next, defendant argues that defense counsel was ineffective for failing to object to inconsistencies with respect to MV's recollection about the timing of a threatening phone call from defendant. Specifically, Johnson's report indicated that defendant made threatening phone calls to the victim "directly after she broke off the relationship on [February 17, 2016]." In contrast, Detective Donald McGehee's report indicated that defendant made threatening phone

calls on February 22, 2016. At trial, MV testified that the recording occurred on February 21, 2016. Defendant argues that counsel failed to "motion to strike the phone call, didn't motion to impeach [MV] based upon these lies." These arguments lack merit.

In regard to defense counsel's failure to move to strike the recording of the phone call, we note that defendant fails to cite any law or make a cognizable argument regarding why the call was inadmissible evidence. Accordingly, he has abandoned that aspect of his argument. See *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998) ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority."). With respect to his argument about counsel's "failure to impeach" MV, defendant has failed to show that counsel's strategic decision regarding what questions to ask the witnesses about the phone call fell below an objective standard of reasonableness. The jury was apprised of MV's inconsistency when Detective McGehee testified that the call logs showed that the phone call was recorded on February 22, 2016. The jury was therefore free to infer that MV was not credible when she testified that the call occurred on some point other date. See *Unger*, 278 Mich App at 222. Defense counsel was not deficient in his handling of the phone call.

Defendant also argues that MV lied about her interactions with Deputy Kline. However, the jury heard both MV's and Deputy Kline's testimonies and any potential inconsistencies and was free to weigh MV's credibility. Defendant cannot show that defense counsel's strategic decisions regarding what questions to ask Deputy Kline and MV amounted to deficient performance on an objective standard of reasonableness. See *Davis*, 250 Mich App at 368.

Next, in his Standard 4 brief, defendant argues that defense counsel was ineffective in failing to "Motion to impeach . . . Johnson, nor did counsel motion to strike claims of key." This argument lacks merit. Deputy Johnson's report was based on an interview that he had with MV at the YWCA; at trial, Deputy Johnson testified that he inspected MV's apartment and observed a broken key in the lock on the entry door. There was nothing in the report that contradicted Deputy Johnson's observations at the apartment, and contrary to defendant's argument, nothing in the record supports claims of "perjured testimony" or "unpreserved evidence" with respect to this testimony. Defense counsel was not deficient in cross-examining Deputy Johnson.

Finally, in his Standard 4 brief, defendant argues that defense counsel was ineffective for failing to subpoena MV's Verizon and Google phone records from February 22, 2016, through March 2, 2016, and for failing to enter e-mails into evidence. Defendant contends that the phone records could have shown that MV invited defendant over to her apartment on February 22, 2016, the night of the assault, and that MV sought to maintain a relationship with defendant.

Defendant cannot show that failure to subpoena the phone records denied him a substantial defense. While the phone records may have shown that MV's phone called defendant's phone, the records would not have shown the content of the phone calls. Thus, contrary to defendant's argument, the phone records would not have shown that MV invited him over to her apartment. Furthermore, the evidence presented at trial showed that MV was in contact with defendant during the days leading up to and after the assault and that she attempted to salvage her relationship with defendant even after the assault. Thus, phone records would not

have shed any new light on the nature of defendant's relationship with MV and counsel was not deficient in failing to subpoena the records.

Similarly, defendant cannot show that failure to introduce certain text messages and e-mails amounted to deficient performance. Defendant attaches a series of what appear to be text messages, which, according to defendant, were sent between him and a woman named SK between February 21, 2016, and March 18, 2016. Defendant contends that these messages corroborated his testimony that he had "moved on" from MV and was entering into a relationship with SK. This argument also lacks merit. At trial, defendant testified that he and SK were entering into a relationship, yet defendant agreed that he maintained contact with MV and was consistently breaking up and getting back together with MV. Moreover, disproving defendant's relationship with SK was not a central part of the prosecution's case, and the corroborating text messages would not have made a difference in the outcome of the trial.

The same analysis applies to the e-mails allegedly between defendant and MV. Defendant argues that these e-mails would have shown that MV wanted to remain in a relationship with him even after the day of the assault. However, as noted previously, MV admitted during her testimony that after the assault, she thought it was possible to move forward with her relationship with defendant if defendant agreed to attend counseling. She agreed that two days after the assault, she asked defendant to attend family counseling together, and that on February 25, 2016, she sent defendant an e-mail about joint counseling. Given this testimony, the jury was aware that MV attempted to move forward with her relationship after the assault such that evidence of the e-mails would not have made a difference at trial.

In short, defense counsel was not deficient in failing to introduce evidence of the phone calls, text messages, or e-mails. See *Trakhtenberg*, 493 Mich at 51.

III. PROSECUTORIAL MISCONDUCT

Next, in his Standard 4 brief, defendant raises several claims of prosecutorial misconduct. We review these unpreserved claims for plain error affecting defendant's substantial rights. *Unger*, 278 Mich App at 235. We review claims of prosecutorial misconduct case by case, viewing the alleged improprieties in context to determine whether the defendant was denied a fair and impartial trial. *People v Paquette*, 214 Mich App 336, 342; 543 NW2d 342 (1995).

Defendant's first argument concerns statements that the prosecutor made during voir dire, articulating that the burden of proof was "beyond a reasonable doubt," and not "beyond all doubt." This did not amount to misconduct because the prosecutor was simply reciting the correct legal standard. See *Sullivan v Louisiana*, 508 US 275, 278; 113 S Ct 2078; 124 L Ed 2d 182 (1993) (noting that "the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt."). Moreover, the trial court instructed the jury on the presumption of innocence and the "beyond a reasonable doubt" burden of proof. In short, the prosecutor did not engage in misconduct during voir dire or deny defendant a fair trial.

Next, defendant argues that the prosecutor denied him due process by withholding exculpatory evidence in an effort to admit other-acts evidence under MRE 404(b).

"A criminal defendant has a due process right to obtain exculpatory evidence possessed by the prosecutor if it would raise a reasonable doubt about defendant's guilt." *People v Cox*, 268 Mich App 440, 448; 709 NW2d 152 (2005), citing *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963). In order to establish a *Brady* violation, defendant must prove:

> (1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material. . . . Evidence is favorable to the defense when it is either exculpatory or impeaching. . . . To establish materiality, a defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." [*People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014) (citations omitted).]

Defendant's argument concerns the May 6, 2013 incident involving JP when, according to JP, defendant entered her home without permission and physically forced her into her bedroom and tried to have sex with her. Defendant contends that there is an inconsistency in the police report involving that incident and JP's testimony at the pretrial evidentiary hearing. In particular, the responding officer reported that, "I checked her clothing and found no rips or any sign of forced removal," whereas JP testified at the evidentiary hearing that she recalled telling defendant, "you're ripping my pants," and that she heard her pants ripping.

This inconsistency, if any, does not amount to a *Brady* violation or any other misconduct. There is nothing in the record to support that the prosecution withheld the police report or that defendant did not have access to the report in time for the evidentiary hearing. Regarding the inconsistency between the testimony and the report, we note that the prosecutor did not attempt to hide the inconsistency, and defendant was free to impeach JP at the hearing and at trial. See, e.g., *People v Parker*, 230 Mich App 677, 690; 584 NW2d 753 (1998) (rejecting claim of prosecutorial misconduct when while there were some discrepancies in the testimony of the prosecutor's witnesses, the prosecutor did not attempt to conceal the contradictions).

Defendant also contends that the police report of the May 6, 2013, incident indicated that the responding officer observed text messages on defendant's phone and that the officer indicated "those text messages have been saved . . . ." Defendant contends that had the prosecutor not suppressed these text messages, then the trial court would have excluded JP's testimony.

Defendant's argument fails for several reasons. First, nothing in the record shows that the officer preserved the text messages as defendant alleges or that the prosecution possessed the messages as of 2016. Defendant had access to the police report, and he could have inquired about the status of the text messages, but there is no indication that he did so. Second, nothing supports that the text messages would have had any impact in this case. Defendant does not cite any legal authority to support that the trial court would have suppressed JP's testimony about other acts had the text messages been introduced into evidence. Rather, defendant could have impeached JP's testimony on the basis of the police report alone. Defendant has failed to show that the prosecutor suppressed evidence or engaged in any other misconduct related to JP's testimony.

Finally, defendant argues that the prosecutor engaged in misconduct by allowing MV and Deputy Johnson to offer "perjured testimony." Defendant appears to argue that MV and Deputy Johnson offered testimony that was inconsistent with the police reports. Defendant fails to cite specifically where in the trial transcripts that MV and Deputy Johnson allegedly offered perjured testimony and instead directs this Court to other parts of his Standard 4 as it pertains to perjured testimony." In doing so, defendant has abandoned this issue. See *People v Traylor*, 245 Mich App 460, 464; 628 NW2d 120 (2001) ("Defendant may not leave it to this Court to search for a factual basis to sustain or reject his position.") (quotation marks and citation omitted).

Moreover, defendant conflates inconsistencies in a police report with perjury, and the inconsistencies listed by defendant do not establish that the prosecutor knowingly used perjured testimony to obtain defendant's conviction. See *Parker*, 230 Mich App at 690. While some of the witnesses' testimony was inconsistent with prior testimony or statements given to police, the prosecutor did not attempt to conceal those inconsistencies, and defendant was free to impeach the witnesses during cross-examination, which, as discussed above, defense counsel attempted to do. *Id*. Defendant's argument does not concern perjury, but rather concerns an issue of credibility. Defense counsel explored credibility issues with the victim and the other witnesses, and the jury was free to believe or disbelieve any or all of the victim's trial testimony. *Unger*, 278 Mich App at 222. The prosecutor did not engage in misconduct.

## IV. OTHER-ACTS EVIDENCE

Finally, in his Standard 4 brief, defendant argues that the trial court abused its discretion in admitting other-acts evidence under MRE 404(b) and under MCL 768.27b.

We review a trial court's decision to admit evidence for an abuse of discretion. *People v Bynum*, 496 Mich 610, 623; 852 NW2d 570 (2014). "Preliminary questions of law, such as whether a rule of evidence or statute precludes the admission of particular evidence, are reviewed de novo . . . ." *Id*. Necessarily, a trial court abuses its discretion when it admits evidence that is inadmissible as a matter of law. *Id*.

### (1) MRE 404(B)

At trial, JP's other-acts testimony was admitted under MRE 404(b). The trial court instructed the jury that this evidence could only be considered to determine whether "defendant had a reason to commit the crime or that the defendant acted purposefully—that is, not by accident or mistake or because he misjudged the situation—or that the defendant used a plan, system, or characteristic scheme that he has used before or since."

On appeal, defendant argues that the trial court erred in admitting "police reports" about the May 6, 2013 incident with JP. However, the police report was not admitted as an exhibit at trial, but rather, JP testified about the incident that was documented in the police report. Accordingly, we address whether the trial court erred in admitting JP's testimony.

Generally, evidence of prior bad acts "is not admissible to prove the character of a person in order to show action in conformity therewith." MRE 404(b)(1). But evidence of other bad acts may be admissible to show "motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident." MRE 404(b)(1).

In *People v VanderVliet*, 444 Mich 52; 508 NW2d 114 (1993), amended on other grounds 445 Mich 1205 (1994), our Supreme Court set forth the following four-part test that governs the admissibility of other-acts evidence under MRE 404(b):

> First, that the evidence be offered for a proper purpose under Rule 404(b); second, that it be relevant under Rule 402 as enforced through Rule 104(b); third, that the probative value of the evidence is not substantially outweighed by unfair prejudice; fourth, that the trial court may, upon request, provide a limiting instruction to the jury. [*Id*. at 55.]

With respect to proof of a common plan or scheme, our Supreme Court has explained that "evidence of similar misconduct is logically relevant to show that the charged act occurred where the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system." *People v Sabin (After Remand)*, 463 Mich 43, 55-56; 614 NW2d 888 (2000). "There must be *such a concurrence of common features* that the charged acts and the other acts are logically seen as part of a general plan, scheme, or design." *People v Steele*, 283 Mich App 472, 479; 769 NW2d 256 (2009).

In this case, the evidence was probative of something other than defendant's propensity to commit the charged offense. Specifically, the evidence tended to establish that defendant acted according to a common plan or scheme to force his former partners into having sex, which, in turn tended to show that defendant intended to act without MV's consent. Here, defendant's assault of JP and his assault of MV shared common features beyond the mere commission of an assault of women. Both instances involved situations in which the victim had recently ended a relationship with defendant. Defendant appeared at both victim's homes unannounced and when the victims were at home alone. In both instances, defendant entered the home without permission and physically forced the victim into her bedroom where he then pinned the victim to the bed. In the uncharged assault, defendant forcibly attempted to remove JP's clothing; similarly, in the charged offense, defendant forcibly removed MV's clothing. Finally, in both instances, defendant attempted to convince the victim to have sex.

These circumstances evince "such a concurrence of common features that the charged acts and the other acts are logically seen as part of a general plan, scheme, or design" because defendant would take advantage of a prior domestic relationship and attempt to physically force his former partners to have sex with him. *Steele*, 283 Mich App at 479. In turn, evidence of the common plan or scheme tended to show that defendant had intent to force the victim to have sex with him and refuted the defense theory that the sex was consensual. Accordingly, the evidence was logically relevant to prove something other than defendant's propensity to commit the charged offense. See *VanderVliet*, 444 Mich at 65 ("Relevant other acts evidence does not violate Rule 404(b) unless it is offered solely to show the criminal propensity of an individual to establish that he acted in conformity therewith.").

Having concluded that the evidence was logically relevant to show a permissible purpose under MRE 404(b), this Court must next determine whether the trial court properly concluded that "the probative value of the evidence is not substantially outweighed by unfair prejudice . . . ." *VanderVliet*, 444 Mich at 55. This determination "requires nothing more than

-12-

the balancing process described in MRE 403." *People v Starr*, 457 Mich 490, 498; 577 NW2d 673 (1998). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." MRE 403. This Court applies a two-part test to determine whether evidence is *unfairly* prejudicial. First, the Court must decide if introduction of the other-acts evidence at trial was unfairly prejudicial. And, second, this Court must apply the balancing test and weigh the probative value or relevance of the evidence against the danger of unfair prejudice. *Id.*; *People v Cameron*, 291 Mich App 599, 611; 806 NW2d 371 (2011).

In this case, JP's testimony was not "unfairly prejudicial." "The 'unfair prejudice' language of MRE 403 refers to the tendency of the proposed evidence to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *Id.* (some quotation marks and citations omitted). "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998). Here, JP's testimony did not "stir such passion as to divert the jury from rational consideration of" defendant's guilt or innocence of the charged offense. *Cameron*, 291 Mich App at 611-612. The evidence was of an isolated incident, was probative of something other than defendant's character, and the trial court gave the jury a limiting instruction.

In addition, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. MRE 403. Here, the evidence was more than "marginally probative." *Crawford*, 458 Mich at 398. At trial, the defense theory was that MV had consensual sex with defendant, but JP's testimony showed that defendant acted according to a common plan or scheme pursuant to which he took advantage of a prior domestic relationship and attempted to force his prior partner to have sex with him. This, in turn, was probative of defendant's intent and showed that defendant intended to force MV to have sex with him despite her protestation. Moreover, there was no danger that the probative value of the evidence would be substantially outweighed by the danger of unfair prejudice because the evidence was admitted for a proper purpose and the trial court provided a limiting instruction to the jury. In short, the trial court did not abuse its discretion in concluding that the probative value of the evidence was not outweighed by the danger of unfair prejudice.

In sum, the trial court did not abuse its discretion in admitting JP's testimony under MRE 404(b) because the evidence was relevant for a nonpropensity purpose, and the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

### (2) MCL 768.27B

MCL 768.27b provides in relevant part as follows:

(1) Except as provided in subsection (4),[1] in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of

---

[1] MCL 768.27b(4) concerns acts of domestic violence that occurred more than 10 years before the charged offense and is not at issue in this case.

the defendant's commission of other acts of domestic violence is admissible *for any purpose for which it is relevant*, if it is not otherwise excluded under [MRE] 403. [Emphasis added.]

MCL 768.27b(5)(a)(*i*) defines "domestic violence" and "offense involving domestic violence" in part to include, "[c]ausing or attempting to cause physical or mental harm to a family or household member."

"The statute thus in certain instances expands the admissibility of domestic-violence other-acts evidence beyond the scope permitted by MRE 404(b)(1) . . . ." *People v Mack*, 493 Mich 1, 2; 825 NW2d 541 (2012). The statutory language "clearly indicates that trial courts have discretion to admit relevant evidence of other domestic assaults *to prove any issue, even the character of the accused*, if the evidence meets the standard of MRE 403." *Cameron*, 291 Mich App at 609 (quotation marks and citation omitted; emphasis added).

In this case, under MCL 768.27b, the trial court admitted evidence that defendant punched and pulled MV's hair during an incident in September 2014 when MV was driving a vehicle and defendant was a passenger. The trial court did not err in doing so.

There is no dispute in this case that defendant was charged with one count of domestic violence under MCL 750.81(2). Evidence that defendant previously punched MV in the arm and pulled her hair during an argument constituted an "other act" of "domestic violence," as that term is defined in MCL 768.27b(5)(a)(*i*). There was no evidence of self-defense, defendant perpetrated physical harm upon MV during the incident, and MV was a "household member" as she and defendant lived together at the time. MCL 768.27b(5)(a)(*i*). Moreover, the evidence was relevant in that it tended to show that defendant acted violently and used physical violence against MV during their relationship. This, in turn, was relevant to show that defendant committed subsequent acts of violence against MV, including the charged offenses. MRE 401; *Cameron*, 291 Mich App at 609. It was also relevant to show why MV was afraid CPS would become involved if she reported the sexual assault in this case to police. Specifically, MV testified that after the September 2014 incident in the car, CPS became involved; she was afraid that CPS would again become involved if she reported the February 22, 2016 assault to the police because her children were in the home at the time of the assault.

In addition, the trial court did not abuse its discretion in holding that the evidence was not barred by MRE 403, which provides in part that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."

In this case, the evidence was not "unfairly prejudicial." *Cameron*, 291 Mich App at 611. The nature of the evidence was not such that it posed a risk to "stir such passion as to divert the jury from rational consideration of [defendant's] guilt or innocence of the charged offenses." *Id*. at 611-612. The evidence concerned an isolated incident, and the trial court provided a limiting instruction to the jury wherein the court directed the jury not to convict defendant based on past conduct. Furthermore, there was no risk that the probative value of the evidence would be substantially outweighed by the danger of unfair prejudice. See *id*. The evidence was more than "marginally probative." *Id*. Instead, the evidence was highly probative in that it tended to show

that defendant used physical violence against MV during their relationship, which in turn, tended to refute the defense theory that the sex was consensual.

In sum, defendant's prior act of domestic violence against MV was relevant to the prosecution's domestic violence charge under MCL 768.27b, and the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice under MRE 403. Accordingly, the trial court did not abuse its discretion in admitting the evidence.

We affirm.

/s/ Jane E. Markey
/s/ Michael J. Kelly
/s/ Thomas C. Cameron