*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MYRON DAVIS,

        Defendant-Appellant.

UNPUBLISHED
May 22, 2026
8:41 AM

No. 364034
Wayne Circuit Court
LC No. 16-008385-01-FC

Before: LETICA, P.J., and GARRETT and FEENEY, JJ.

PER CURIAM.

In 2017, a jury convicted defendant, Myron Davis, of murdering Glynn Stephenson. In addition to convicting Davis of second-degree murder, MCL 750.317, the jury also convicted Davis of carrying a concealed weapon, MCL 750.227, felon in possession of a firearm, MCL 750.224f, felon in possession of ammunition, MCL 750.224f(6), and possession of a firearm during a felony, MCL 750.227b. This Court affirmed Davis's convictions. *People v Davis*, unpublished per curiam opinion of the Court of Appeals, issued May 16, 2019 (Docket No. 338112) (*Davis I*).[1]

Thereafter, Davis moved for relief from judgment, primarily arguing that the prosecution failed to disclose that its key witness, Quinetell Ray, received a favorable plea agreement in exchange for his testimony. The trial court denied Davis's motion, and this Court denied Davis's delayed application for leave to appeal.[2] Our Supreme Court remanded this case to this Court for consideration as on leave granted.[3] On September 11, 2024, we vacated the trial court's order in part and remanded for the trial court to hold an evidentiary hearing addressing whether Ray

---

[1] Our Supreme Court denied Davis's application for leave to appeal this Court's decision. *People v Davis*, 504 Mich 999; 934 NW2d 252 (2019).

[2] *People v Davis*, unpublished order of the Court of Appeals, issued April 25, 2023 (Docket No. 364034).

[3] *People v Davis*, 513 Mich 921; 997 NW2d 215 (2023).

received a favorable plea agreement in exchange for testifying against Davis and, if so, the extent of the prosecutor's knowledge of the agreement.[4] Following the evidentiary hearing, the trial court determined that the evidence failed to show that Ray received a favorable plea agreement in exchange for his testimony. Therefore, the court again denied Davis's motion for relief from judgment. We conclude that the trial court erred by denying Davis's motion because the prosecution suppressed evidence of a favorable plea agreement provided to Ray in exchange for his testimony, failed to correct Ray's false testimony that he did not receive consideration for testifying against Davis, and falsely stated during closing argument that Ray did not receive a benefit for his testimony. Accordingly, we reverse and remand for a new trial.

## I. FACTS AND PROCEEDINGS

## A. TRIAL

On July 28, 2016, Stephenson was fatally shot at Johnson Center Park in Detroit. Before going to the park, Stephenson drove around the area in his girlfriend's minivan with Ray and Ray's girlfriend, Sinora. At approximately 8:00 or 9:00 p.m., they drove past the park and saw Kevin Martin, Ronald Branam, David Thornton, and "Mookie" at the park. Stephenson parked the minivan toward the end of the street because he and Davis were involved in an altercation, and he did not want Davis to see the vehicle and become aware that he was at the park. After parking the minivan, Stephenson and Ray walked to the park while Sinora remained in the vehicle.

Ray testified at trial that, at some point after he and Stephenson arrived at the park, Davis appeared from around a corner. He wore black shoes, black shorts, and a black t-shirt that he had pulled up over the top of his head. Ray was able to see the handle of a gun protruding from the pocket of Davis's shorts. Davis called Stephenson's name, and Ray told Stephenson to go back to the minivan. Stephenson responded that Davis "ain't gonna do nothing" and walked up to Davis. According to Ray, Davis swung his gun at Stephenson and then began firing it toward Stephenson, prompting Stephenson to run around to avoid being struck with gunfire. Stephenson suffered four gunshot wounds to his lower body, including two to his left ankle. Ray testified that, after Davis stopped shooting and walked away, Stephenson crawled toward Ray and asked Ray to take him to the hospital. Davis turned around, walked back to Stephenson, and shot him in the face, killing him.

Davis became a suspect within hours of the shooting. Stephenson's sister, Ayanna Stephenson, received numerous calls from people who said they saw Davis shoot Stephenson, but were scared to implicate Davis in the shooting. Ayanna called the police and told them about the phone calls. She also told them that Davis and Stephenson had a long history and that Davis had threatened to kill Stephenson on numerous occasions. Police officers discovered that Davis was on parole and contacted his parole officer. After determining that Davis violated the terms of his parole, officers arrested him on a parole violation just before 3:00 a.m. on July 29, 2016, only five or six hours after the shooting. Police interviewed Davis, who admitted that he knew Stephenson and that Stephenson was unarmed at the time of the shooting. Davis also stated that he was "not

---

[4] *People v Davis*, unpublished order of the Court of Appeals, issued September 11, 2024 (Docket No. 364034).

solely responsible" and adamantly denied shooting Stephenson. He further stated, "I've been to the penitentiary four mother f***ing times. If I'm going to do something, best believe I'm going to make sure every mother f***er's going to see it because I'm tired of mother f***ers telling on me sending me to penitentiary." Davis then asked for a lawyer, and the interview ended.

Although Stephenson was a close friend of Ray, Ray did not report the incident to the police after the shooting. Instead, he talked to the police about one month after the shooting when he was incarcerated and awaiting trial on charges of receiving and concealing a stolen vehicle and resisting or obstructing a police officer. At that time, he talked to the police, who offered to inform the prosecutor that he was cooperating with Davis's case. Ray ultimately testified before the grand jury in Davis's case, entered into a plea and sentence agreement in his own case, and testified at Davis's trial.

At trial, Ray testified that he saw Davis shoot Stephenson. Davis's attorney cross-examined Ray about when he talked to the police, whether he was on probation at that time, and the new charges that led to his arrest. Ray maintained that the police approached him to talk about the shooting, and he did not approach the police. He testified that he was incarcerated in jail for three months and received a probationary sentence that required him to wear a tether. He expected the tether to be removed one or two months following his testimony. On redirect, the prosecutor questioned Ray as follows about the plea deal:

> *Q*. Okay. So you—you pled guilty?
>
> *A*. Yeah.
>
> *Q*. Okay. And you took a plea deal?
>
> *A*. Yeah.
>
> *Q*. Okay. Was your testimony in this case at all—
>
> *A*. (Interposing) No.
>
> *Q*. —contemplated in that plea deal?
>
> *A*. No.

Deborah Broogerdi, Bobby Porter, and Calvin Kendricks testified that they lived near the park and heard the shooting. Broogerdi recalled that she looked out her window and saw a person lying on the ground. She described the shooter as a black man in his 30s or 40s who wore dark blue shorts and a t-shirt. Porter heard "a commotion" coming from the park that sounded like people arguing. He then heard gunshots and screams. Kendrick saw two men "tussling" and one of the men shoot the other. Broogerdi and Kendrick believed they heard the name "Tyrone."

Some of the people at the park that night also testified. Thornton testified that he saw Stephenson talking to someone in a black sweatshirt or hoodie who also had something over his head. Thornton heard gunshots and saw "a guy in all black running" away who appeared to be the same person he saw talking to Stephenson. Branam testified that he saw Stephenson and Ray and

heard the shooting, but did not see the shooter. According to Branam, Davis called him after the shooting. Police discovered an outgoing call to Branam from the phone number associated with Davis.

Martin gave inconsistent testimony at trial, and his testimony also conflicted with statements he made to the police during an interview after the shooting. Martin testified that he was at the park on the night of the shooting, but he initially denied seeing Davis at the park. He later admitted that Davis dropped him off at the park before the shooting. Martin also admitted that, while at the park, he sent a text message to Davis that said, "Dog out here," and that Davis called him about three minutes after he sent the message. Martin maintained that the reference to "dog" referred to himself, but the prosecutor asserted during closing arguments that Martin's explanation defied common sense and that Martin instead sent the message to let Davis know that Stephenson was at the park because he knew that Davis wanted to kill Stephenson. Martin further testified that he heard gunshots after he walked from the park to a nearby store and discovered that Stephenson was dead when he returned to the park.

The prosecutor played the video of Davis's police interview at trial. The prosecutor also presented evidence that police recovered Davis's DNA under Stephenson's fingernails, and Davis's cell phone was in the vicinity of the park at the time of the shooting based on cell tower data. During closing arguments, the prosecutor maintained that the jury could convict Davis based on Ray's identification testimony alone. She argued, "I could have just put Mr. Ray up here and if you believed him, that would be enough for you to convict him." She then argued that Ray's testimony was credible and that other evidence corroborated his testimony. Defense counsel asserted that Ray's testimony was not credible, arguing as follows:

> But the police came to him [i.e., Ray], he's in custody, he's on probation for a felony. He picked up two new felony charges. He's probably looking at prison.
>
> And the police come to him and say—now, not—I don't know if they collaborated with him or said we'll put in a good word for you, I don't know if this was done friendly [sic], because I wasn't privy to that statement. I have no idea what happened. Okay.
>
> But what I know is, he's in a—he's in a bind at that point. The police come to him and they want Myron Davis. They've had Myron Davis locked up for a month.
>
> They're trying to build a case against Myron Davis . . . .
>
> * * *
>
> [N]ow, when [Ray] is in custody with the police, within that amount of time he testifies [before the grand jury] and then he's out and about. He's out and living his life, enjoying himself.

Now, he has to come in and the prosecutor says, what's his motive for it?  I don't know.  You know what, I don't have the burden of proof in this case.  I don't know what his motive is, but why don't you think about a couple of things here.

The police come to him and say, we're looking for Myron Davis about this shooting last month.  He says, sure, I'll send Myron Davis, because it suits his interest that time.  Maybe they put in a good word for him, maybe they didn't.

Because the court reporter's tape malfunctioned, a portion of the prosecutor's rebuttal argument was not transcribed.[5]  Following trial, the parties stipulated that, although not transcribed, the prosecutor argued during rebuttal that "Ray received no special consideration from the prosecutor's office during his pending case—he was not given any plea offer by the office and pled as charged with a sentence set by his judge[.]"  The jury convicted Davis as previously described.

## B.  POSTCONVICTION PROCEEDINGS

In Davis's appeal of right, he argued he was denied his constitutional right to an appeal because of the missing transcript pages; the prosecutor engaged in misconduct by knowingly presenting Martin's false testimony and impermissibly commenting on Martin's veracity during closing argument; he was denied his right to the effective assistance of counsel when defense counsel failed to object to the prosecutor's presentation of Martin's perjured testimony and improper commentary during closing argument; and the prosecutor engaged in misconduct during the grand jury proceedings by failing to call Broogerdi and Kendricks to testify.  As previously stated, this Court affirmed Davis's convictions in *Davis I*.

In March 2021, Davis moved for relief from judgment, arguing that Ray received a favorable plea agreement in exchange for his testimony, the prosecutor failed to disclose the agreement to the defense, and the prosecutor knowingly elicited false testimony from Ray and failed to correct his testimony denying that he received a plea agreement in exchange for testifying against Davis.  In addition, Davis argued that he received ineffective assistance of trial and appellate counsel, and the police seized a cell phone associated with him in violation of his Fourth Amendment rights.  The trial court denied the motion.  Davis moved for reconsideration on the basis that it was apparent from the court's opinion that the court mistakenly believed that Davis was calling into question the testimony of Martin rather than Ray.  The court then ordered the prosecutor to respond.  After the prosecutor responded, the court again denied the motion.

As previously indicated, this Court denied Davis's delayed application for leave to appeal, and our Supreme Court remanded this case to this Court for consideration as on leave granted.  Following oral argument before this panel, we vacated the trial court's order in part and remanded for the trial court to hold an evidentiary hearing "concerning whether Quinetell Ray received a

---

[5] A portion of Martin's testimony was also not transcribed.

favorable plea agreement in exchange for his testimony in this case and, if so, the nature and extent of the prosecutor's involvement with or knowledge of that agreement."[6]

On remand, the trial court held an evidentiary hearing over the course of three days. The parties stipulated that, after Davis's trial, Ray died. The parties also stipulated to the admission of three transcripts involving the proceedings against Ray. At a September 30, 2016 calendar conference, Ray's attorney, Kristine Longstreet, stated as follows:

> *MS. LONGSTREET:* Um, there's no one else in this courtroom, so I will speak freely.
>
> Mr. Ray has provided some information in regards to a homicide. Um, and Ms. Posigian, Anna Posigian is the prosecutor in that case along with Detective Lalone. Um, this case is part of the PATU Unit [i.e., Police Auto Theft Unit].
>
> I spoke to Mr., um—
>
> *MS. TU* [the prosecutor]: Beadle.
>
> *MS. LONGSTREET*: —Beadle this morning and he made an offer of eight months. And he said that he was aware of the other, um, details, but I needed to, um, speak with, uh, the sergeant and the supervisor for the Homicide Unit and have them send over a memo and we're—we'll likely work this out. That's the long and short of it.

Thereafter, Ray pleaded guilty pursuant to the following plea agreement that the prosecutor stated on the record:

> Uh, if the defendant pleads guilty to Count 1, stolen property, receiving and concealing motor vehicle, Pat Code 750.5357, a five year felony, then the People will dismiss Count 2, resisting and obstructing a police officer. We'll withdraw the, uh, notice to enhance, uh, fourth offense notice, and we'll agree to, uh, probation term of 24 months with GPS tether and restitution to be determined.

Immediately after Ray tendered his plea, the following exchange occurred:

> *MS. LONGSTREET:* Your Honor, um, we're asking that you place Mr. Ray on a personal bond with a tether.
>
> May we approach?
>
> *THE COURT*: Yes.

---

[6] *People v Davis*, unpublished order of the Court of Appeals, issued September 11, 2024 (Docket No. 364034).

*MS. LONGSTREET:* Okay.

*MR. TORRES* [the prosecutor]: Thank you, your Honor.

(At 12:26 p.m. bench conference off the record)

(At 12:28 p.m. bench conference concluded)

*THE COURT*: All right. Uh, I'm gonna place, um—I'm gonna reduce the defendant's bond and, uh, place him on a $10,000 personal bond with a tether.

Now, Mr. Ray, um, when I was asking you about whether you were on probation or parole earlier and you said no, there—you might be on probation to Judge Bill on something.

You don't remember that?

*THE DEFENDANT*: Oh, yeah, your Honor.

*THE COURT*: On a marijuana case.

*THE DEFENDANT*: Yeah.

*THE COURT*: Is that still open?

*THE DEFENDANT*: Um, I think so.

*THE COURT*: Um, all right.

Well, I can place you on a personal bond on this case, but if there's a warrant out or a unresolved, um, pending warrant on that probation case, then, um, you're gonna be held on that matter. We're gonna try to find out.

See if you can find out, would you.

*THE CLERK*: There is no warrant.

MS. LONGSTREET: Okay. If there's no warrant, then there's no issue.

*THE COURT*: There's no warrant.

*MS. LONGSTREET*: Okay.

*THE COURT*: Yeah, okay.

*MS. LONGSTREET*: Well, then we'll just—um, I'll let them know.

*THE COURT*: You know, this could be a case where I—the last time we were on the record, I might have said I'll try to get the case from Bill.

*MS. LONGSTREET*:  It—I think the court may have said something to that effect.

*THE COURT*:  Well, okay.  There's no warrant, so he's be [sic] out on bond.

So we'll set a sentence date.

At Ray's sentencing, the trial court also addressed Ray's probation violation in the case before Judge Bill, stating that Judge Bill had given the court authority to handle that case in Judge Bill's absence.  The court closed the marijuana case without improvement, stating "no point in having him on two probations."  The court noted that Ray's sentencing guidelines seemed high for a receiving and concealing stolen property conviction, and realized that Ray's prior convictions had increased his guidelines range.  The court remarked, "I'm going to, uh, sentence you consistent with the sentence agreement here.  But, boy, you're getting, um, very quickly to the point where, uh, you're not gonna get any more breaks like this."  The court noted that if Ray violated his probation, he could face a prison sentence of 23 months to 5 years.  In addition, the following exchange occurred:

*MS. LONGSTREET*:  So, so, your Honor, Mr., uh, Ray, he understands what position he's in.  One of the reasons, um, for the, for this were some—there were some extenuating circumstances.  And if the court recalls, there were some things that, um, led to the prosecute—prosecutor showing him a huge amount of deference based on some of the—

*THE COURT:*  Yeah.

*MS. LONGSTREET*:  —things that he, he's done.

*THE COURT*:  Yeah.

I remember.  Okay.

*MS. LONGSTREET*:  And so with that, your Honor, um, we understand you're placing him on probation.  Ask the court to make it a limited time of probation.

Um, in addition, there is a agreement for [a] tether.  I don't think we indicated how long that tether should be.

\* \* \*

*THE COURT*:  Are you on a tether now?

*THE DEFENDANT*:  Yes.  I been on there since I got out, out of jail.  I been in the house almost every day.

*THE COURT*:  So why does he need to be on a tether while he's on probation?

*MR. TORRES*:  Your Honor, those are the, the terms.  What we wanted to do is just keep track.

*MS. LONGSTREET*:  May—your Honor, may I approach?

*MR. TORRES*:  For purpose of the, of the tether would just be to track the defendant.

*THE COURT*:  Well, it does, it does, uh, complicate things though.  I mean it complicates his ability to work.

Well, all right.  It was part of the plea agreement.

*MS. LONGSTREET*:  Right.

Uh, your Honor, can we approach?

*THE COURT:*  Yeah.

*MS. LONGSTREET*:  Okay.

(At 11:49 a.m. bench conference off the record)

(At 11:53 a.m. bench conference concluded)

*THE COURT*:  All right.  We had some further discussions about the tether requirement.  Um, I think the, the main goal of the tether is so that the Department of Corrections can maintain, um, a location on where Mr., uh, Ray is, not so much to confine him.  So I'm going to impose the GPS tether.

At the evidentiary hearing on remand, the parties stipulated that the prosecutor's file in Ray's case could not be located.  The appellate prosecutor in Davis's case indicated that she had attempted to locate the file for the previous two years.  Longstreet testified that she could not specifically recall the September 30, 2016 calendar conference in Ray's case, but after reviewing the transcript, she assumed that her reference to "details" referred to Ray's cooperation in Davis's case.  She agreed that the sentence contemplated as part of Ray's plea at the time of the calendar conference was eight months in jail and that, one week later when Ray tendered his plea, the sentence agreement was for 24 months' probation.  Longstreet had no independent recollection of what occurred during that week that changed the sentence agreement, and she had no memory of the particular case that Ray was cooperating with, although, as the transcript indicated, Posigian was the prosecutor in the case.  Felipe Karian-Torres, the prosecutor handling Ray's case, did not specifically recall Ray's case at the time of the evidentiary hearing and did not recall speaking to Posigian about Ray's case.

The parties stipulated to the admission of a video recording of Ray's interview with Sergeant Robert Lalone and Detective Matthew VanRaaphorst, the officer in charge of Davis's case.  Davis's attorney, Daniel J. Blank, asserted that the recording was not discovered until 2024, eight years after the jury convicted Davis.  Blank subpoenaed the homicide file, and moved to

admit as evidence two documents from the file: a September 2, 2016 progress note indicating that VanRaaphorst attended a meeting with Posigian and Ray on that date to discuss the case and an October 19, 2016 progress note from VanRaaphorst stating that a copy of the video was sent to Posigian. The trial court admitted the documents.

Posigian[7] testified that she likely watched the video of Ray's interview with Lalone and VanRaaphorst before she questioned Ray during the grand jury proceeding. Ray testified before the grand jury on August 31, 2016. Posigian testified that she always turned over all discovery in her cases or made materials available for defense counsel to view at her office or the police department. She maintained that she would not have sent a copy of the video to defense counsel in 2016, but rather, she would have made it available for pickup at her office or delivered it to counsel at a court proceeding. Posigian did not specifically recall counsel picking up a copy of the video or providing counsel with a copy of the video.

Regarding the meeting with Ray and VanRaaphorst on September 2, 2016, Posigian testified that the purpose of the meeting was likely to review questions with Ray before he testified before the grand jury. As previously stated, however, Ray testified before the grand jury on August 31, 2016, three days before the meeting occurred. Posigian maintained that she did not recall meeting with Ray and VanRaaphorst for any other purpose. She denied any knowledge of the police discussing a plea deal with Ray and denied that anyone from the PATU told her about plea negotiations involving Ray. When asked whether she discussed Ray's charges with anyone in the PATU, she responded, "I don't believe I did, no." She was aware in 2016 that Ray violated his probation and had recently been charged in a new case, but testified, "I did not involve myself in his cases." She maintained that Ray's plea was "a very standard plea for defendants in Wayne County, plead to one [charge], dismiss the other [charge]." She denied that Ray's plea was in exchange for his testimony against Davis. She admitted questioning Ray about a plea deal at Davis's trial in response to defense counsel's questions. She stated that she "asked the question so the jury would know straight from Mr. Ray himself whether there was any sort of deal to testify or not." Posigian also testified, however, that if a witness in one of her cases received a plea deal, she would not necessarily talk to the witness about it. She stated that Ray's new case was "a low level severity felony" and reiterated that her office typically offered pleas to dismiss one charge in exchange for a plea on the other charge. She admitted talking to Ray's probation officer after Davis's trial because Ray expressed concern for his safety and the safety of his family members. She asserted that Ray's probation was closed "not too long" after he testified because Davis threatened him, and he moved out of Michigan.

Lalone recalled that, during his interview, Ray expressed concern for his and his family's safety. Lalone also recalled telling Ray that he was "the captain of the ship" and "in charge of his own destiny" regarding the charges against him. Lalone admitted talking to Dennis Doherty, who led the PATU, regarding "a plea agreement that would compel [Ray] to cooperate[.]" According to Lalone, Doherty responded that he had to talk to Ray's attorney.

---

[7] After Davis's trial, Posigian married and changed her surname to Merigian. Because this appeal involves conduct that occurred before she married and changed her name, we refer to her as Posigian.

VanRaaphorst corroborated Lalone's testimony about speaking to Doherty. According to VanRaaphorst, he and Lalone met in person with Doherty to let Doherty know that Ray was cooperating with a homicide investigation. VanRaaphorst denied that he or Lalone asked Doherty for special consideration in Ray's case in exchange for his cooperation, and VanRaaphorst was unaware whether Ray received special consideration. When asked whether he told Posigian about his discussion with Doherty, VanRaaphorst responded, "I don't remember if I would have relayed that information to Miss Posigian. I don't see why I wouldn't, but I don't specifically remember doing that." VanRaaphorst admitted that Ray was cooperating and "was basically the most important witness" in the case, but he denied promising Ray anything in return for his cooperation.

Following the evidentiary hearing, the trial court determined that the evidence failed to show that Ray received a favorable plea agreement in exchange for his testimony against Davis. The court reasoned that the plea form and plea hearing transcript in Ray's case failed to indicate that any promises were made to Ray in exchange for his testimony. The court also noted that the witnesses at the evidentiary hearing failed to disclose "any secret deals," and Davis's trial attorney was aware of Ray's plea and sentence agreement at the time of trial and cross-examined Ray regarding the agreement.[8] The court further determined that the evidence failed to show Ray knowingly made a false statement during trial or the prosecution suppressed evidence favorable to Davis. In addition, the court opined that, even if the prosecution failed to disclose evidence, no reasonable probability exists that the result of the proceeding would have been different if defense counsel had impeached Ray regarding "a speculative undisclosed agreement." The court therefore again denied Davis's motion for relief from judgment.

## II. STANDARDS OF REVIEW

We review for an abuse of discretion a trial court's decision on a motion for relief from judgment. *People v Washington*, 508 Mich 107, 130 n 9; 972 NW2d 767 (2021). An abuse of discretion occurs when the court's decision falls outside the range of reasonable and principled outcomes or when the court makes an error of law. *People v Swain*, 288 Mich App 609, 628-629; 794 NW2d 92 (2010). We review for clear error the trial court's findings of fact supporting its decision on a motion for relief from judgment. *Id*. at 628. A finding is clearly erroneous when we are left with the definite and firm conviction that a mistake has been made. *People v Byars*, 346 Mich App 554, 562; 13 NW3d 328 (2023).

## III. ANALYSIS

### A. LEGAL PRINCIPLES

The defendant bears the burden of establishing entitlement to relief under MCR 6.508(D). *People v Christian*, 510 Mich 52, 75; 987 NW2d 29 (2022). The defendant may not raise grounds for relief, except jurisdictional defects, that could have been raised on direct appeal or in a prior motion for relief from judgment unless they demonstrate good cause for failing to previously assert such grounds on appeal or in the prior motion. MCR 6.508(D)(3)(a). The defendant may establish

---

[8] Davis's trial attorney was aware that Ray had entered into a plea agreement, but not that the agreement included testifying against Davis.

-11-

good cause by proving that they received ineffective assistance of appellate counsel. *People v Spears*, 346 Mich App 494, 504 n 3; 13 NW3d 20 (2023). In order to establish ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's deficient performance, the outcome would have been different. *People v Yeager*, 511 Mich 478, 488; 999 NW2d 490 (2023).

"Once a defendant demonstrates good cause, a new trial is only warranted if they also show 'actual prejudice from the alleged irregularities that support the claim for relief.' " *Christian*, 510 Mich at 75, quoting MCR 6.508(D)(3)(b). The defendant may establish actual prejudice by demonstrating, "but for the alleged error, the defendant would have had a reasonably likely chance of acquittal[.]" MCR 6.508(D)(3)(b)(i)(A). "Alternatively, a defendant can show actual prejudice where there is an 'irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case[.]' " *Christian*, 510 Mich at 75, quoting MCR 6.508(D)(3)(b)(iii).

Davis argues that Posigian failed to inform defense counsel about a plea and sentence agreement between the prosecutor's office and Ray in exchange for his testimony. Davis asserts that Posigian's failure to advise counsel of the agreement violated MCR 6.201(B)(5)[9] and *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). To establish a *Brady* violation, the defendant must show: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014). "Evidence is favorable to the defense when it is either exculpatory or impeaching." *Id*. When a witness's reliability may be determinative of guilt or innocence, the nondisclosure of evidence affecting the witness's credibility falls within the scope of *Brady*. *Id*. "To establish materiality, a defendant must show that 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " *Id*., quoting *United States v Bagley*, 473 US 667, 682; 105 S Ct 3375; 87 L Ed 2d 481 (1985). This standard does not require the defendant to demonstrate "that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Id*. (quotation marks and citation omitted). Rather, "[t]he question is whether, in the absence of the suppressed evidence, the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. (quotation marks and citation omitted).

## B. APPLICATION

Davis has demonstrated good cause for failing to previously raise his *Brady* claim. Although Davis's appellate attorney in *Davis I* touched on the issue, counsel failed to properly raise the argument. Davis's brief on appeal in *Davis I* stated as follows:

---

[9] MCR 6.201(B)(5) provides that, upon request, the prosecuting attorney must provide the defendant with "any plea agreement, grant of immunity, or other agreement for testimony in connection with the case."

It is difficult to believe that Ray received no consideration for his testimony, considering the fact he had legal issues that eventually became insignificant. It is also difficult to believe Ray was not influenced for his testimony, like Kevin Martin, for telling a particular story to fit the prosecution's proofs. Circumstantial evidence suggests Ray received a benefit for testifying, which would raise significant due process concerns.

Davis's attorney did not address the issue further and did not include the issue in the statement of questions presented. Merely hinting that Ray likely received a benefit for his testimony, without more, failed to properly raise the argument before this Court, and this Court therefore did not address it. Counsel's failure to raise the issue fell below an objective standard of reasonableness. As discussed below, if counsel had reviewed the calendar conference, plea, and sentencing transcripts in Ray's case, counsel would have become aware that Ray did indeed receive a benefit in exchange for his testimony.

The evidentiary hearing on remand was held on October 25, 2024, November 11, 2024, and January 30, 2025. The events and proceedings relevant to this case and Ray's case occurred in 2016 and early 2017. A recurring theme during the evidentiary hearing was that the witnesses were largely unable to recall details of what occurred in 2016 and 2017. Karian-Torres, the assistant prosecutor who appeared at Ray's plea and sentencing hearings, testified that he had no recollection of the case. Likewise, Longstreet, Ray's attorney, testified that she did not recall the specific plea offer that the prosecutor's office made to Ray. She assumed based on the transcripts in Ray's case that Ray cooperated with the prosecution in Davis's case. Although the transcripts do not provide many details regarding Ray's plea and sentence agreement, they provide enough details to affirmatively show that Ray received consideration in his case in exchange for testifying against Davis.

At Ray's September 30, 2016 calendar conference, Longstreet stated as follows:

Um, there's no one else in this courtroom, so I will speak freely.

Mr. Ray has provided some information in regards to a homicide. Um, and Ms. Posigian, Anna Posigian is the prosecutor in that case along with Detective Lalone. Um, this case is part of the PATU Unit.

I spoke to Mr., um . . . Beadle this morning and he made an offer of eight months. And he said that he was aware of the other, um, details, but I needed to, um, speak with, uh, the sergeant and the supervisor for the Homicide Unit and have them send over a memo and we're—we'll likely work this out. That's the long and short of it.

If Ray did not receive a plea deal in exchange for his testimony, as Posigian maintained at the evidentiary hearing, Longstreet would not have made the statement referencing Davis's case and indicated that she needed to speak to the homicide unit supervisor.

Although the prosecution's offer at the time of the calendar conference was eight months in jail, one week later, at Ray's plea hearing, Karian-Torres indicated that the prosecution's offer was two years' probation. Longstreet testified that she did not recall what occurred during the

-13-

week between the calendar conference and plea to explain the difference in the sentence agreement. In addition to the sentence, the prosecution agreed to dismiss the resisting and obstructing charge and withdraw the fourth-habitual offender enhancement. Although Ray indicated that nobody had promised him anything else in exchange for his plea, the record in his case demonstrates otherwise. Immediately after tendering his plea, Longstreet requested a personal bond with a tether and asked to approach the bench. Following a discussion at the bench, the trial court agreed to a personal bond with a tether.

At Ray's sentencing, the trial court remarked that Ray would be facing prison time if he violated probation. Longstreet then referred to "extenuating circumstances" that led the prosecution to show Ray "a huge amount of deference" based on "things that he, he's done." The court then questioned why Ray needed to be at home on a tether during his probation because it interfered with his ability to work. Karian-Torres stated that the tether was simply "to track the defendant." Longstreet asked to approach the bench. After the bench conference, the trial court stated that it would impose the tether and that the purpose of the tether was to show Ray's location rather than confine him.

Ray testified at Davis's trial approximately four months after his sentencing. Less than two months later, his tether was removed and his probation closed. He served less than six months of a two-year probationary sentence. Posigian testified at the evidentiary hearing that she had no knowledge of a plea deal in exchange for Ray's testimony against Davis. She also testified that a plea agreement to dismiss one charge in exchange for a plea to a second charge was a standard plea offered in Wayne County. The transcripts in Ray's case reveal that Ray accepted a deal to testify in Davis's case. It is implausible that Posigian was unaware that the key witness in Davis's case testified pursuant to a plea agreement. Notably, when asked about the September 2, 2016 meeting with Ray and VanRaaphorst, Posigian testified that she generally meets with witnesses before they testify at a grand jury proceeding to review questions with them. She assumed that the purpose of the meeting was to review Ray's grand jury testimony. The record shows, however, that Ray testified before the grand jury on August 31, 2016, three days before the meeting. Therefore, the purpose of the meeting clearly could not have been to discuss Ray's grand jury testimony. In any event, it is irrelevant whether Posigian personally was aware of Ray's plea agreement. "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v Whitley*, 514 US 419, 437; 115 S Ct 1555; 131 L Ed 2d 490 (1995). If a prosecutor is required to discover favorable evidence known to the police, the prosecutor certainly is required to discover favorable evidence known to a fellow assistant prosecutor in the same office, and such evidence is properly imputed to the trial prosecutor.

For the foregoing reasons, the record shows that Posigian suppressed evidence favorable to Davis. The trial court clearly erred by determining that Ray did not receive a favorable plea deal in exchange for his testimony. A review of Ray's calendar conference, plea, and sentencing transcripts compels no other conclusion. Although the trial court opined that the witnesses at the evidentiary hearing failed to "disclose[] any secret deals," the court failed to appreciate the witnesses' general lack of recollection of the relevant events and the unlikelihood that a witness would have been inclined to disclose a "secret deal." In addition, although the court stated that Ray denied receiving any promises in exchange for his plea, the court failed to acknowledge and explain the references to Davis's case in the proceedings in Ray's case.

-14-

Posigian compounded the *Brady* error by eliciting testimony from Ray that the plea deal he accepted was not in exchange for his testimony against Davis. The prosecution may not use false testimony to secure a conviction and has an affirmative duty to correct false testimony. *People v Brown*, 506 Mich 440, 446; 958 NW2d 60 (2020). Not only did Posigian fail to correct Ray's false testimony, but she argued during closing argument that Ray did not receive consideration in his case in exchange for testifying against Davis.

We conclude that the suppressed evidence was material and there exists a reasonable probability that absent the errors involving Ray's testimony—the failure to disclose Ray's plea agreement, the failure to correct his false testimony, and the affirmative assertion to the jury that Ray did not receive special consideration in exchange for his testimony—Davis would have had a reasonably likely chance of acquittal. Ray was the only witness who testified that he saw Davis shoot Stephenson. Although Stephenson had Davis's DNA under his fingernails, Martin testified that he saw Stephenson and Davis together earlier in the day and they appeared to have been fighting because they were sweaty and out of breath. Ray, however, testified that Stephenson and Davis were not together earlier that day and that he knew this because he was with Stephenson all day. Further, Martin testified that a cell phone used in the area around the time of the shooting was not Davis's personal cell phone, but rather, was a "run phone" used by many people to purchase cocaine.

Martin and Ray were the prosecution's two key witnesses. Martin had credibility issues, about which the attorneys questioned him. The jury was therefore aware of those issues. Although the attorneys questioned Ray to some extent about his credibility, because of the prosecutorial errors, the jury was not informed of the substantial leniency that the prosecutor's office granted to Ray, which directly weighed on his credibility and possible motive for testifying. During defense counsel's closing argument, he twice mentioned Ray's motive for testifying and stated that he did not know whether the police "put in a good word" for Ray with the prosecutor's office. But, not only did the police "put in a good word" for Ray, Ray received a plea agreement that resulted in his immediate release from incarceration after he tendered his guilty plea. We therefore conclude that Davis would have had a reasonably likely chance of acquittal but for the prosecution's suppression of Ray's plea agreement and knowing presentation of false testimony upon which Posigian relied during closing argument in support of her claim that Ray's testimony was credible. Further, aside from Davis's chance of acquittal but for the prosecution's conduct, this strikes us as an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case[.]" MCR 6.508(D)(3)(b)(iii).

## IV. CONCLUSION

We reverse the trial court's June 21, 2022 and February 25, 2025 orders denying Davis's motion for relief from judgment and remand for a new trial. Considering our determination, we need not address Davis's remaining arguments asserting ineffective assistance of counsel for

failing to discover and impeach Ray with his recorded police interview and failing to seek suppression of the cell phone evidence and redaction of Davis's statement to the police.

Reversed and remanded. We do not retain jurisdiction.

/s/ Kristina Robinson Garrett
/s/ Kathleen A. Feeney